958 F.2d 709
 34 Fed. R. Evid. Serv. 1446
 Allen D. HEFLIN, and his wife Jean LaRue Heflin, and Rue
Ellen Heflin, next of kin and survivors of Hugh
Allen Heflin, deceased, Plaintiffs-Appellees,
v.
STEWART COUNTY, TENNESSEE, David Hicks, Harry Joe Crutcher,
and Wanda Luffman, Defendants-Appellants.
 No. 90-6585.
 United States Court of Appeals,
Sixth Circuit.
 Argued Nov. 21, 1991.
Decided March 9, 1992.
Rehearing En Banc Denied June 3, 1992.
 
 Joseph H. Johnston (briefed), Nashville, Tenn., R. Stephen Doughty (argued), Bussart, Buffaloe & Doughty, Nashville, Tenn., for plaintiffs-appellees.
 George A. Dean, Parker, Lawrence, Cantrell & Dean, Nashville, Tenn. (argued and briefed), for defendants-appellants.
 Before KENNEDY and BOGGS, Circuit Judges and LIVELY, Senior Circuit Judge.
 LIVELY, Senior Circuit Judge.
 
 
 1
 The family of a twenty-year old pretrial detainee who committed suicide in the Stewart County, Tennessee jail sued the county, the sheriff, one deputy and the jailer under 42 U.S.C. § 1983. A jury awarded damages to the plaintiffs and the defendants appeal. The defendants seek reversal based on the district court's denial of their motion for a directed verdict at the conclusion of the plaintiffs' case, renewed after both sides had rested. On appeal the defendants contend that the evidence was insufficient for the submission of two issues to the jury: (1) whether any act or failure to act of the defendants was the proximate cause of the inmate's death; and (2) whether any defendant acted with deliberate indifference to the inmate's medical needs after he was discovered hanging in his cell. The individual defendants also argue that they were entitled to judgment on the basis of qualified immunity. Stewart County seeks reversal as well on the ground that no county policy or custom led to the inmate's death.
 
 I.
 
 2
 Hugh Allen Heflin, unmarried, a life-long resident of Stewart County, was arrested pursuant to a capias warrant on September 3, 1987. Heflin apparently had an alcohol problem, and had been arrested on earlier occasions. On June 8, 1987, Tennessee State Trooper John Smothers had arrested Heflin on a misdemeanor charge and lodged him in the Stewart County jail. While there, Heflin was involved in some sort of altercation in which he was injured. He filed a complaint with the FBI charging that Smothers and Deputy Sheriff Anderson had beaten him. The FBI had begun an investigation at the time of the September 3 arrest, but had not yet interviewed Heflin. An agent had interviewed Stewart County Sheriff Hicks, a defendant in this action, and Hicks had stated that Heflin's injuries were self-inflicted.
 
 
 3
 Jailer Luffman saw Heflin writing at a desk in his cell at approximately 11:30 a.m. on September 3. At about 11:45 a.m., inmate Richardson, who was a jail trusty, noticed that the shower in Heflin's cell was running. Some fifteen minutes later, at about noon, another inmate, Austin, informed Deputy Sheriff Crutcher that the shower in Heflin's cell had been running for a long time, "probably around fifteen minutes." Austin had called to Heflin but received no response.
 
 
 4
 Deputy Crutcher went to Heflin's cell and saw a sheet tied to the cell bars. He immediately went to the dispatcher's office for keys, returned and opened Heflin's cell. While in the office, Crutcher directed Jailer Luffman and the dispatcher to call Sheriff Hicks and the emergency ambulance service. Luffman's report showed this call at 12:06 p.m. When Crutcher entered the cell he saw Heflin "hanging by the neck on the far side of the shower stall." Heflin's hands and feet were tied together, a rag was stuffed in his mouth, and his feet were touching the floor. Inmate Austin followed the deputy into the cell; Crutcher told him to leave. With the body still hanging, Crutcher checked for a pulse and signs of respiration, but found none though the body was warm. He also opened Heflin's eyes and found his pupils were dilated. From these observations Crutcher concluded that Heflin was dead. While Crutcher was still alone in the cell with the hanging body, inmate-trusty Richardson, who had heard of the hanging upon returning from an errand, came in with a knife that he had picked up in the kitchen. Rather than using the knife, with Richardson's assistance, to cut Heflin's body down, Crutcher ordered Richardson out of the cell.
 
 
 5
 The evidence is conflicting as to whether the emergency medical team (EMT) or Sheriff Hicks arrived next. At any rate, neither the sheriff nor an EMT member supported Heflin's body or cut it down. EMT member Hollis testified that he examined the body for vital signs and found none. Hollis stated that he believed Heflin had been hanging "for at least twenty minutes" before he arrived.
 
 
 6
 Dr. Robert Lee, the County Medical Examiner and the only physician practicing in Stewart County, arrived at the jail at approximately 12:12 p.m. Dr. Lee examined the still-hanging body, then ordered the staff to cut it down and place it on a cot. Sheriff Hicks directed a deputy to take pictures of the hanging body before it was taken down. Dr. Lee examined the body in a prone position, then directed the EMT members to remove Heflin to his office for an electrocardiogram (EKG). Dr. Lee stated on the death certificate that the time of death was 12:30 p.m. and the cause of death was strangulation. There is no dispute about the cause of death.
 
 II.
 
 7
 The defendants contend that there was no evidence that their action or inaction was the proximate cause of Heflin's death. They argue that Heflin was dead when Crutcher discovered him hanging, and for this reason they were entitled to a directed verdict. The plaintiffs, on the other hand, point to several items of evidence that they contend created a jury issue on proximate cause. We agree with the plaintiffs and the district court.
 
 A.
 
 8
 In his report of the incident, Deputy Crutcher wrote that Dr. Lee believed he heard a heartbeat upon his initial examination of the hanging body. The report stated: "At 12:12 p.m., Dr. Robert Lee arrived at the Sheriff's Department. After checking Mr. Heflin he thought he heard a heartbeat. He advised us to cut Mr. Heflin down." At trial, when asked by the plaintiffs' lawyer if Dr. Lee actually made such a comment, Crutcher answered, "Yes, sir, that's what he said." In addition, a jail inmate named Thompson testified that he could only hear "bits and pieces" of the conversation in Heflin's cell. It was his recollection, however, that Dr. Lee said he thought Heflin "had a pulse, but he didn't." EMT member Hollis testified that Dr. Lee directed the EMT's to "get him down quick to my office where I can run an EKG on him." He also stated that Dr. Lee said, "[T]here'll probably be a hell of a lawsuit over this."
 
 
 9
 Dr. Lee testified that when he arrived at the jail he examined Heflin's chest with a stethoscope, but was unable to hear anything because there was a lot of talking and noise in the background. After quieting the onlookers Dr. Lee examined Heflin again and found no vital signs. He testified that after the body was cut down and put on the cot, he never heard a heartbeat or saw any evidence of life. According to Dr. Lee, it would be more difficult to check the vital signs of a body hanging by the neck than one "laid out flat on the floor."
 
 B.
 
 10
 The plaintiffs' witness, Dr. Richard Treat, testified as a medical expert. The defendants did not challenge his qualifications. Dr. Treat testified that even if no heartbeat or respiration was detected when Deputy Crutcher found Heflin hanging, there was up to a ten percent chance that Heflin could have been resuscitated if he had been cut down and these efforts had been "commenced immediately." The witness explained that it appeared from photographs that Heflin's airway obstruction was about eighty-five percent rather than total. A person could still survive for somewhere between twenty minutes and an hour with such an obstruction.
 
 
 11
 When asked to assume that Dr. Lee heard a heartbeat eight minutes after initial discovery of the body by Deputy Crutcher, Dr. Treat testified that in such a case, "then resuscitative efforts initiated eight minutes previously should have virtually confirmed survival, successful outcome." The chance for a young, healthy person surviving under these conditions would be "certainly above ninety-five percent." Dr. Treat testified that hanging creates a "high grade obstruction" but that strangulation by hanging "takes a long time, twenty, thirty, forty minutes to actually die by partial strangulation." The defendants concentrate on Dr. Treat's "up to ten percent" evaluation of the likelihood of resuscitation, while the plaintiffs emphasize his evaluation of "certainly above ninety-five percent."
 
 C.
 
 12
 In passing on a motion for a directed verdict, the trial court views all evidence in the light most favorable to the nonmoving party and gives that party the benefit of all reasonable inferences flowing from the evidence. McDowell v. Rogers, 863 F.2d 1302, 1307 (6th Cir.1988). Having done this, without weighing the evidence or evaluating the credibility of witnesses, the court may grant a directed verdict only if it finds "that reasonable minds could not differ as to the governing facts." Id. Applying this standard we cannot find that the district court erred in denying the defendants Sheriff Hicks and Deputy Crutcher's motion insofar as it related to proximate cause.
 
 
 13
 No one ever attempted to resuscitate Heflin. Both Crutcher and Hicks were trained in CPR. Deputy Crutcher could have called on Jailer Luffman and trusties Austin and Richardson to assist in supporting the body and cutting it down. Instead, he sent Luffman back to the office and ordered Austin and Richardson out of the cell, even though Richardson came with a knife that could have been used to cut the bed sheets. Crutcher was not trained to determine whether a person was dead or alive. EMT member Hollis testified that he and the other team member did nothing with respect to Heflin's body because county policy in the absence of vital signs was, "[W]e don't do nothing until the proper authority says do something." It was stipulated that Sheriff Hicks is the policymaker regarding the sheriff's department and the county jail. Sheriff Hicks was present either at the time the EMT arrived, or came immediately after them. Yet, he ordered no one to attempt to revive Heflin, or even to cut him down for resuscitation efforts.
 
 
 14
 Dr. Lee was never asked if he made the comment about hearing a heartbeat as recorded by Deputy Crutcher in his incident report and verified from the witness stand. He testified that he could not hear because of the noise in the area and that he asked the onlookers to be quiet. He stated that after the body had been cut down and laid on a cot he detected no signs of life. Nevertheless, he directed EMT Hollis to get Heflin to his office "quick" so he could administer an EKG. And, according to Hollis, Dr. Lee remarked that there would be a lawsuit over the incident. From this evidence the jury could reasonably infer that Dr. Lee believed after he arrived that there was a possibility that Heflin was still alive. The jury could further accept Dr. Treat's uncontradicted testimony that if there was a heartbeat, resuscitation efforts undertaken immediately would have carried at least a ninety-five percent chance of success, that is, of survival. Dr. Treat also testified that a person who is revived after partial strangulation for a period of twenty minutes or so would likely suffer no severe brain damage. He could be expected to "have moderate to good functional capacity following successful resuscitation."
 
 
 15
 There clearly was evidence from which the jury could find that Heflin died as a proximate result of the failure of Sheriff Hicks and Deputy Crutcher to take any steps to save his life. They left Heflin hanging for twenty minutes or more after discovering him even though the body was warm and his feet were touching the floor. Crutcher even prevented trusties Richardson and Austin from assisting. We find no such culpability with respect to Jailer Luffman, however. She only followed the orders of Crutcher and Hicks and was never in a position either to help Heflin herself or cause anyone to attempt to help him. The district court should have granted Ms. Luffman's motion for a directed verdict.
 
 III.
 
 16
 The parties agree that in order to recover under the circumstances of this case the plaintiffs were required to demonstrate that the defendants' conduct amounted to "deliberate indifference to [Heflin's] serious medical needs." Pretrial detainees have a constitutional right to the same protection afforded convicted prisoners who have serious medical needs. See Roberts v. City of Troy, 773 F.2d 720, 723 (6th Cir.1985), where Judge Kennedy summarized the Supreme Court's holdings in Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979) and Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). As with the first issue, the question for decision is whether there was sufficient evidence of deliberate indifference to take this case to the jury.
 
 A.
 
 17
 Both Sheriff Hicks and Deputy Crutcher testified that in their opinion a reasonably competent officer would have believed Heflin was dead when he was first discovered. This being so, they argue, their failure to attempt to revive Heflin provides no evidence of deliberate indifference to the inmate's serious medical needs. They point out that everyone who checked Heflin for vital signs, including Dr. Lee, thought he was dead. Both denied harboring any ill will toward Heflin and testified that they treated the situation in his cell as "the scene of a crime." Thus, they did not disturb any object in the cell, including the hanging body. Both defendants denied ever having been instructed or advised that CPR should be administered to a person found hanging even if no vital signs are detected. Even if they were wrong in assuming that Heflin was dead and that no attempt to revive him was indicated, the defendants assert that this would demonstrate nothing more than an error of judgment in a stressful situation, not deliberate indifference or conduct that shocks the conscience.
 
 
 18
 The plaintiffs respond that there is an abundance of evidence from which the jury could conclude that the defendants acted with deliberate indifference. The FBI investigation of Heflin's complaint was still open. Hicks had been questioned about that incident and Crutcher knew about the complaint. Moreover, a parole officer who came to the jail with Sheriff Hicks testified that five or six minutes after he and Hicks arrived the witness went to the cell with State Trooper Smothers, one of the persons named in Heflin's complaint. The parole officer stated that no one else was in the cell and that Heflin was still hanging. Trooper Smothers shined his light on Heflin's face, and then the two of them left. The witness could not tell whether Heflin was dead or alive. The FBI notified Trooper Smothers several weeks later that the investigation of Heflin's complaint had been closed.
 
 B.
 
 19
 The evidence chiefly relied upon by the district court in refusing to direct a verdict for failure to demonstrate deliberate indifference was the testimony of Edward Totten. Without challenge to his qualifications, Totten testified as an expert in the field of correctional institutions. Under local rules, Totten read a prepared statement to the jury before responding to questions. In that statement Totten stated, "The training provided by the Tennessee Corrections Institute and every other jailer training program that I am familiar with requires a jailer, when he discovers an inmate hanging, to find something or someone to support the person's weight, to call for assistance, and assure the immediate application of first aid and/or CPR by trained persons."
 
 
 20
 The statement added that the jailer should cut the victim down immediately with one person holding the body up and the other cutting the noose. Officers should never stand by and let the hanging victim continue to hang in order to protect the "scene of the crime." Further, even though there are no vital signs, officers should not presume that death has already occurred. " 'Dead' people are alive today due to CPR." On the contrary, officers should presume that the hanging inmate is alive and administer first aid until told by a physician to stop. Totten emphasized that Heflin's body was still warm and that his feet were touching the floor. "For the Sheriff, Deputy Crutcher and Jailer Luffman to allow him to continue to hang unsupported and withhold the life saving measures mandated by TCI Training under these circumstances is contrary to their training and common sense."
 
 
 21
 Deputy Crutcher testified that he had taken jailer training at the Tennessee Corrections Institute (TCI) in 1985, but could not remember being instructed that upon discovering a person hanging to first support the victim's weight in order to take the pressure off his neck and throat. His recollection was that he was trained to check for vital signs then "call for help and leave him hanging."
 
 C.
 
 22
 Recognizing the force of Totten's testimony, the defendants seek reversal on the ground that the district court committed error by permitting Totten to state a conclusion of law. The witness's written statement concluded, "In my opinion, they were deliberately indifferent to Mr. Heflin's needs for emergency care which could have saved his life." The real problem with this statement, according to the defendants, is that it did not assist the jury in determining whether the defendants were deliberately indifferent to Heflin's medical needs. Rather, it constituted an opinion on a key legal issue in the case, and was inadmissible under Rule 702 of the Federal Rules of Evidence. Rule 702 provides:
 
 
 23
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
 
 
 24
 The plaintiffs respond that, in context, Totten's opinion was based on the facts and on his conclusion that the defendants had completely disregarded the prescribed practices for dealing with an inmate found hanging. He used "deliberately indifferent" in the way an ordinary layman would to describe such conduct--to state his opinion on the ultimate fact, not to state a legal conclusion. The district court's instructions, in addition to advising that an expert's opinions should be received with caution, charged the jury that in order for the defendants to be liable, their conduct must be "deliberately indifferent tantamount to an intent to punish" or "conduct which shocks the conscience." Totten did not express an opinion on whether the defendants' conduct was tantamount to an intent to punish or shocked the conscience.
 
 
 25
 Rule 704 of the Federal Rules of Evidence, dealing with expert testimony, provides that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Under Rule 702 a qualified expert may testify by "opinion or otherwise" on matters within his specialized knowledge if such testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue." Rule 704 abolishes a long recognized "ultimate issue" objection to opinion testimony and shifts the focus of the inquiry to "whether the testimony is 'otherwise admissible.' " The decision to admit or exclude such evidence ultimately turns on whether it is helpful to the trier of fact. Torres v. County of Oakland, 758 F.2d 147, 150 (6th Cir.1985).
 
 
 26
 We do not believe the district court committed reversible error in permitting the jury to hear this particular evidence. Totten did not claim to be an expert on the legal requirements for recovery from jail officials for dereliction of duty. He testified concerning the proper procedures to be followed in the situation faced by the defendants. After setting forth in detail the manner in which the defendants failed to follow approved procedures, he stated that in his opinion this conduct demonstrated deliberate indifference to Heflin's need for "emergency care which could have saved his life." The testimony merely emphasized the witness's view of the seriousness of the defendants' failures. Given the generality of the test, "will assist the trier of fact," we find no abuse of discretion in admitting this testimony. See Davis v. Combustion Engineering, Inc., 742 F.2d 916, 919 (6th Cir.1984) (no abuse of discretion to admit opinion testimony of expert where trial court's conclusion that the testimony would assist the jury was not clearly erroneous, "given the broad standards of Rule 702").
 
 D.
 
 27
 The defendants rely on this court's decision in Roberts v. City of Troy, 773 F.2d 720 (6th Cir.1985). Roberts involved a claim by the personal representative of a pretrial detainee who committed suicide in a jail. The plaintiff contended that the defendants failed "to promulgate and enforce procedures to identify potential suicides and prevent their occurrence." Id. at 722. This court affirmed a jury verdict for the defendants. The issue is quite different in the present case. The defendants discovered the inmate in a condition that called for some action on their part. They did nothing, although the expert witness testified that proper procedure required them to cut the victim down and attempt to revive him.
 
 
 28
 We stated in Roberts that a plaintiff must show deliberate indifference, and not just negligence, in order to recover. We continued:
 
 
 29
 [T]he test is whether prison administrators are taking reasonable steps to prevent a pervasive risk of harm. A pervasive risk of harm entails much more than mere negligence.
 
 
 30
 Id. at 724. When Deputy Crutcher discovered the hanging body and when Sheriff Hicks arrived at the cell, there was a "pervasive risk of harm" to Heflin. They took no reasonable steps to attempt to save his life. As we noted in Danese v. Asman, 875 F.2d 1239, 1244 (6th Cir.1989), "It is one thing to ignore someone who has a serious injury and is asking for help; it is another to be required to screen prisoners correctly to find out if they needed help." Heflin had a "serious injury," and his condition cried out for help.
 
 IV.
 
 31
 Stewart County argues that even if the district court correctly denied the individual defendants' motion for directed verdicts, it should have granted the county's motion. A political subdivision such as Stewart County is liable under section 1983 only for injuries that result from an official policy or from governmental custom, even though such custom has not been formally approved. Monell v. New York City Dept. of Social Services, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 2035-36, 56 L.Ed.2d 611 (1978); Molton v. City of Cleveland, 839 F.2d 240, 243-44 (6th Cir.1988). Under appropriate circumstances, a single decision by policymakers may be sufficient to satisfy the "policy requirement" of Monell. Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). The district court gave a comprehensive instruction on this issue, and the defendants made no objections.
 
 
 32
 The defendants assert that there was no evidence that the county had a policy or custom requiring officers on the scene of a suicide attempt at a jail to leave an inmate found hanging while pictures were taken and until the medical examiner arrived. Furthermore, the county had sent Deputy Crutcher for training at the Tennessee Corrections Institute. If he failed to follow required procedures as instructed at the institute--or forgot his instructions--the county cannot be held liable for his derelictions.
 
 
 33
 This argument overlooks the fact that Sheriff Hicks was the sole policymaker for the conduct of jail officials. Deputy Crutcher testified that he followed jail policy in not cutting Heflin down and attempting to revive him.
 
 
 34
 Also, Sheriff Hicks's wife, who worked as a dispatcher in the jail, testified that her training was that if she discovered a suicide in progress, she was not to enter the cell alone, to always get help. "And the biggest thing I can remember is them telling us not to cut him down until help arrived." When asked if she had been instructed to support the victim's weight until there was help in cutting him down, she replied: "Not prior to '87 (the year of Heflin's death). Prior to '87, we were just instructed to not let him, the person, hit their head while taking them down." Ms. Hicks did not say who instructed her, but her testimony appeared to reflect Stewart County jail policy as stated by Deputy Crutcher.
 
 
 35
 Both Crutcher and Hicks were trained in CPR. Furthermore, after the sheriff arrived at the jail he did nothing other than follow the same policy or custom described by Crutcher. In fact, after Dr. Lee arrived and directed that Heflin be cut down, Sheriff Hicks delayed that procedure until photographs could be taken of the hanging body.
 
 
 36
 The district court properly submitted the issue of county jail policy or custom to the jury. The evidence was sufficient to support the jury's verdict awarding damages against the county.
 
 V.
 
 37
 The district court denied the defendants' motion to dismiss or for summary judgment on the basis of qualified immunity. The defendants now argue that the court should have submitted their qualified immunity defense to the jury. That is clearly not the law. We stated in Poe v. Haydon, 853 F.2d 418, 424 (6th Cir.1988), that "[r]esolution of qualified immunity is purely a question of law." The trial judge "bears the ultimate responsibility" of resolving the questions raised by a defense of qualified immunity. Id. (quoting Dominque v. Telb, 831 F.2d 673, 677 (6th Cir.1987)).
 
 
 38
 An official relying on this defense must plead qualified immunity. If possible, the trial court then decides the issue on the basis of the pleadings, or pleadings and discovery. If there is "a factual dispute (i.e., a genuine issue of material fact) involving the question on which immunity turns," summary disposition is improper and the case must go to trial. The Supreme Court has stated,
 
 
 39
 whether an official protected by qualified immunity may be personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, Harlow [v. Fitzgerald], 457 U.S., at 819 [102 S.Ct. 2727, 2738, 73 L.Ed.2d 396], assessed in light of the legal rules that were "clearly established" at the time it was taken, id., at 818 [102 S.Ct. at 2737].
 
 
 40
 Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).
 
 
 41
 For a right to have been "clearly established" something more than a general constitutional right such as due process must have been recognized. Thus, the right must be established in a "more particularized ... sense." Id. at 640, 107 S.Ct. at 3038. This means that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Id.; Danese v. Asman, 875 F.2d 1239, 1242 (6th Cir.1989). It is not necessary that the "very action in question has previously been held unlawful." Rather, the unlawfulness of the action must be apparent to the official "in the light of pre-existing law." Id.
 
 
 42
 There can be no doubt that in 1987 existing law clearly established the right of pretrial jail inmates to receive care for their serious medical needs. At least as early as 1985 we recognized this right as the basis for section 1983 claims involving jail suicides by hanging, referring to the Supreme Court decisions in Estelle v. Gamble (1976) and Bell v. Wolfish (1974). Roberts, 773 F.2d at 723. The unlawfulness of doing nothing to attempt to save Heflin's life would have been apparent to a reasonable official in Crutcher and Hicks's position "in the light of pre-existing law."
 
 VI.
 
 43
 In her dissenting opinion, Judge Kennedy finds a conflict between this majority opinion and that of a different panel of this court in Rich v. City of Mayfield Heights, 955 F.2d 1092 (6th Cir.1992). The facts were significantly different in Rich. We agree with the Rich conclusion that there were no facts that would support a judgment of deliberate indifference in that case. The first person to discover the hanging victim went immediately to call for help. There was no period when responsible officers were doing nothing but waiting for someone else to make the first move, as in the present case. And, of course, Rich did not present the scenario of the ranking county official present directing that the victim not be cut down until photographs could be taken.
 
 
 44
 The dissenting opinion questions the legal standard that we apply in concluding that individual defendants are not entitled to qualified immunity. According to the dissent, only a generalized right to medical care was established, not a particularized right of a hanging victim to be cut down immediately and administered CPR. There is no requirement of absolute factual identity before the law may be found to be "clearly established." Bennis v. Gable, 823 F.2d 723, 733 (3d Cir.1987). The particularized requirement that custodians not act with deliberate indifference to the serious medical needs of pretrial detainees was clearly established. It was stipulated that the individual defendants Hicks and Crutcher had completed the TCI course at which they were instructed that hanging victims must be cut down immediately and given first aid, including CPR. It is reasonable to hold them to a standard that does not permit a victim to remain hanging for eight minutes or more.
 
 
 45
 The dissenting opinion also expresses concern over the "internal inconsistency" of a verdict finding both individual and municipal liability. The complaint clearly shows that Hicks and Crutcher were sued in their official capacities. Furthermore, it was stipulated that Hicks was responsible for formulating policy for the jail and evidence showed that Crutcher followed that policy rather than taking the steps prescribed by the Tennessee Correctional Institute. Under these circumstances we fail to find an inconsistency in holding both the county and these two defendants liable.
 
 
 46
 The judgment against Ms. Luffman is reversed. The judgment awarding damages against Sheriff Hicks, Deputy Crutcher and Stewart County is affirmed. The plaintiffs will recover their costs on appeal from Hicks, Crutcher and Stewart County. Ms. Luffman will recover her costs on appeal from the plaintiffs.
 
 
 47
 KENNEDY, Circuit Judge, dissenting.
 
 
 48
 I am unable to agree with the majority's conclusion that the plaintiffs established a sufficient causal nexus between the failure to act on the part of the individual defendants and the death of the decedent, and therefore respectfully dissent. Further, I do not find a sufficiently particularized constitutional right of a suicide victim to be cut down immediately upon discovery to have been clearly established, and so would accord the individual defendants qualified immunity. I am also troubled by a verdict which essentially finds that the individual defendants, especially Crutcher, acted with a personalized intent to punish the decedent, yet also essentially finds that the individual defendants were executing a county custom or policy. Finally, I would remand the case for a new trial in light of what I consider to be the admission of improper testimony by plaintiffs' expert witness.
 
 
 49
 Fundamental to plaintiffs' recovery is the finding that the decedent could have been revived upon discovery by Deputy Crutcher. I do not believe sufficient evidence was presented to support such a finding. Plaintiffs' expert testified that if no heartbeat was heard by any of the parties checking for vital signs, then the decedent had, at most, up to a ten percent chance of survival. The only evidence offered to support a finding of a heartbeat was hearsay testimony that the county medical examiner, in seeking to quiet the scene during his initial check for vital signs, said that he thought he heard a heartbeat. The doctor himself testified that he never heard a heartbeat. His previous statement and his court testimony are not inconsistent. Several minutes before the doctor's arrival, two EMT's using stethoscopes could not detect a heartbeat. Of four checks for vital signs by trained medical personnel, therefore, the only evidence of a heartbeat came from an alleged statement referring to the possibility of a heartbeat made in quieting a scene that made it difficult, if not impossible, to hear anything. Viewing the evidence in the light most favorable to the non-moving party, McDowell v. Rogers, 863 F.2d 1302 (6th Cir.1988), I find an absence of anything more substantial than a scintilla of hope that there was in fact a heartbeat and therefore a chance of being resuscitated.
 
 
 50
 I am also troubled by the internal inconsistency of a verdict finding both individual liability and municipal liability. The majority upholds the verdict against Stewart County, finding a policy established by the county Sheriff in his official capacity, of not cutting down and resuscitating hanging victims. Acting under this policy, individual actors who fail to cut down hanging victims cannot be said to possess any form of intent to punish a particular detainee, but rather are simply following county policy. Or, vice versa, if the individual actors are found to have acted with a deliberate indifference to the medical needs of the decedent tantamount to an intent to punish, they could not have been following the county policy. I do not see how the deliberate indifference tantamount to an intent to punish and the county policy can both have been the motivation behind the failure to administer CPR and therefore a cause of the death. If we are to uphold the county's liability, the verdict against Crutcher must be set aside.
 
 
 51
 Since the sheriff was both a policy maker and an employee/actor, it may be possible that liability can attach for either one of these roles. However, determining policy is a legislative function for which immunity is traditionally granted. When he carries out that policy as an employee, he should have the same qualified immunity afforded to any other employee. Whichever hat he is determined to be wearing for liability purposes, there cannot be both municipal liability for the policy and individual liability for deliberate indifference.
 
 
 52
 I also disagree with both the legal standard and its application by the majority with respect to the question of qualified immunity for the individual defendants. While it is true that a detainee's generalized right to medical care was clearly established in 1987, see Scharfenberger v. Wingo, 542 F.2d 328 (6th Cir.1976), I do not agree that, properly particularized, the right of hanging victims displaying no vital signs to be immediately cut down and administered CPR by jail officials was clearly established such that a reasonable official would have known of it. See Rich v. City of Mayfield Heights, 955 F.2d 1092 (6th Cir.1992). Further, I disagree with the majority's characterization of the facts at issue here. Crutcher was not indifferent to Heflin's condition. It is undisputed that he immediately called for medical assistance, checked for vital signs, and, finding the pupils dilated and the heart stopped, ensured that no one disturbed the body. It must be kept in mind that unless defendants were consciously aware of the possibility that Heflin was still alive, they could not be guilty of deliberate indifference.[1] Although Crutcher's actions may not have been as efficacious as attempting CPR, they do not constitute nothing, and they certainly meet the standard of medical care that was clearly established as the right of detainees in 1987. Id. at 1097.
 
 
 53
 Finally, I would remand the case in light of what I consider to have been an abuse of discretion on the part of the District Court in allowing the expert penological witness to testify that it was his expert opinion that the defendants were deliberately indifferent to the medical needs of the decedent. Rule 704 of the Federal Rules of Evidence does not operate to open the door to all testimony on ultimate legal issues, but rather shifts the focus to whether the testimony is "otherwise admissible." Torres v. County of Oakland, 758 F.2d 147, 150 (6th Cir.1985). I do not think the testimony here is otherwise admissible for two reasons.
 
 
 54
 First, as noted by the trial judge, the testimony here "smack[s] of just flat out telling how the jury ought to decide the case." As noted in Torres, proper analysis examines whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. Id. at 151. Just as a witness cannot testify that a party was negligent in failing to do something, I believe an expert should not be allowed to state that the party was deliberately indifferent in failing to do something.
 
 
 55
 Second, and more importantly, the witness possessed no specialized knowledge as to the mental state of the individual defendants so as to be able to assist the trier of fact. The witness was a corrections expert. He was therefore qualified to testify to what the defendants' training may have been, or what it should have been. He was in a position to assist the trier of fact as to the standards of care in the corrections field, and as to what a reasonable jailer might have been expected to do.
 
 
 56
 The expert has no specialized knowledge that would assist the trier of fact, however, relating to the mental state and motivation of the defendants. Yet his testimony that they were deliberately indifferent can only encompass his opinion as to their state of mind, i.e. was it accident, happenstance, or negligent error that caused them to fail to cut the victim down, or did they affirmatively and consciously choose to not cut him down? Were they ignorant of his chance of survival, either through inadequate training or negligent response to the circumstances, or did they consciously ignore his known chance of survival? The testimony did more than simply emphasize the witness' view of the seriousness of the defendants' failures to follow proper correctional procedure, as the majority contends, it spoke to defendants' states of mind and mental culpability. Because of the expert's impressive credentials, the jury would be very likely to accept his opinion rather than reach their own.
 
 
 57
 This error cannot be deemed harmless, moreover, in light of the paucity of evidence relating to intent. The only evidence offered indicating any motive or intent to punish the decedent was circumstantial evidence relating to a civil rights complaint filed by the decedent against a Tennessee State Trooper, who was in no way affiliated with the individual defendants or involved in their failure to cut the victim down. It was highly prejudicial, therefore, when the only expert corrections witness at trial testified that in his opinion the defendants had acted with deliberate indifference.
 
 
 58
 For the foregoing reasons, I respectfully DISSENT.
 
 
 
 [1]
 I do not believe that the panel is suggesting that defendants were deliberately indifferent in not acquiring knowledge about possibilities of resuscitating victims