Terrisina JACKSON; and Kateenya Thomas, As Guardian of Her Minor Lee Jackson, Plaintiffs,

v.

John A. JOHNSON, Commissioner of the New York State Division for Youth; Stephen Farkas, Director of the Louis Gossett, Jr. Residential Center; Clarence Thomas, Youth Detention Aide at the Louis Gossett Jr. Residential Center; Jon Lackey, Youth Detention Aide at the Louis Gossett Jr. Residential Center; Gary Wood, Youth Detention Aide at the Louis Gossett Jr. Residential Center; Eric Warner, Youth Detention Aide at the Louis Gossett, Jr. Residential Center; William Saphara, Youth Detention Aide at the Louis Gossett, Jr. Residential Center; Lilia Johnson, Nurse at the Louis Gossett Jr. Residential Center; and Shelly Aubertine, Youth Division Counselor at the Louis Gossett, Jr. Residential Center, Defendants.

No. 1:97–CV–613.

United States District Court, N.D. New York.

Sept. 13, 2000.

---

Koob & Magoolaghan, New York City (Joan Magoolaghan, Elizabeth L. Koob, of counsel), for Plaintiffs.

Davidson & O'Mara, P.C., Elmira, NY (Donald S. Thomson, of counsel), for Defendant John Johnson.

Hon. Eliot Spitzer, Attorney General of the State of New York, Department of Law, Albany, NY (Senta B. Suida, Asst. Attorney General, of counsel), for Defendant Stephen Farkas.

Harris, Beach & Wilcox, LLP, Ithaca, NY (Edward C. Hooks, of counsel), for Defendant Clarence Thomas.

Lopinto, Schlather, Solomon & Salk, Ithaca, NY (Raymond M. Schlather, of counsel), for Defendants Jon Lackey and Gary Wood.

Chernin & Gold, LLP, Binghamton, NY (John P. Rittinger, of counsel), for Defendants William Saphara and Eric Warner.

Young & Paniccia, Binghamton, AL (Alfred Paniccia, Jr. of counsel), for Defendant Lilia Johnson.

Chamberlain & Kaufman, Albany, NY (Alan S. Kaufman, of Counsel), for Defendant Shelly Aubertine.

## MEMORANDUM–DECISION AND ORDER

HURD, District Judge.

## I. INTRODUCTION

On April 28, 1997, the plaintiffs commenced the instant action pursuant to 42 U.S.C. § 1983, alleging that the defendants violated their constitutional rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments.[1] The plaintiffs have also asserted various related state law claims. The defendants moved separately for summary judgment, pursuant to Fed.R.Civ.P. 56.[2] Plaintiffs oppose.[3] Oral argument

---

1. The plaintiffs have withdrawn all claims against the defendants in their official capacities. (See Pls.' Mem. of Law at 2.) Therefore, the plaintiffs are only proceeding against the defendants in their individual capacities.

2. The defendants did, however, submit a Joint Memorandum of Law on Legal Standards, a Joint Reply Memorandum of Law on Legal Standards, and a Joint Appendix.

3. As an initial matter, the plaintiffs argue that the defendants' motions for summary judg-

ment should be denied as untimely. The pretrial scheduling order mandated that all dispositive motions be filed on or before March 15, 2000. See Docket No. 97. Plaintiffs contend that the defendants' Joint Appendix, which was served on February 3, 2000, and Commissioner Johnson's motion for summary judgment, which was served on February 17, 2000 did not afford adequate time, pursuant to L.R. 7.1(b)(1), for opposition and reply papers to be served and filed before the deadline. However, plaintiffs' argument is rendered moot by the fact that they were granted

was heard on June 9, 2000 in Utica, New York. Decision was reserved.

## II. *FACTS*[4]

The following facts are viewed in a light most favorable to the nonmovant plaintiffs. On March 18, 1996, plaintiff Lee Jackson ("Jackson" or "plaintiff"), then fourteen years old, was adjudicated a juvenile delinquent and, by order of the Family Court, was placed in the custody of the New York State Division for Youth ("DFY") for up to one year.[5] Jackson was originally placed in the Oatka Residential Center ("Oatka"), located in Industry, New York, which is near Rochester. After a physical altercation occurred between Jackson and Youth Detention Aides ("YDA") at Oatka, Jackson was transferred to the Louis Gossett, Jr. Residential Center ("Gossett"), which is located near Oswego in Lansing, New York, on May 31, 1996. The officers who transported Jackson told the Intake Officer at Gossett, Brian Sweet, that Jackson assaulted an older staff member and had assaultive propensities. Gossett staff members were then informed of this via entries made in the facility's main log. Jackson cooperated with all intake procedures and was taken to Unit 8.

On the morning of June 1, 1996, Jackson's first day at Gossett, defendants Clarence Thomas ("YDA Thomas") and Jon Lackey ("YDA Lackey") were assigned to Unit 8. At approximately 8:00 a.m., Jackson went to the bathroom. As he exited, he was approached by YDA Thomas, who directed him to go to the juncture office.[6] Apparently, as a new resident, Jackson was not supposed to go anywhere in the facility unless he was accompanied by ·a YDA. In the juncture office, YDA Thomas, who stands 5' 11" and weighs approximately 220 pounds, verbally confronted Jackson, who is approximately 5' 5" and 145 pounds, while YDA Lackey stood at the door. YDA Thomas pushed Jackson backward, forcing Jackson into a chair. At some point thereafter, YDA Thomas initiated a physical restraint technique ("PRT") on Jackson.[7] YDA Lackey, who is 5' 11" and approximately 250 pounds, assisted by taking the secondary position.

YDA Thomas and YDA Lackey continued to apply the PRT for approximately ten minutes before the Youth Division Counselor and Officer of the Day, defendant Shelly Aubertine ("YDC Aubertine"), arrived at the scene. Jackson had initially resisted, but by the time YDC Aubertine arrived, he had become unresponsive. Jackson was clammy, gasping for breath, and salivating. At some point during this restraint, YDA Lackey assumed the primary position and defendant YDA Gary Wood ("YDA Wood") assumed the secondary position. The YDA's continued to ap-

5. In 1998, DFY merged with part of the New York State Department of Social Services to form a new agency, the Office of Children and Family Services. However, since the events giving rise to this lawsuit occurred before the merger, the agency will be referred to in this opinion as DFY.

6. The juncture office is a staff office located between Units 7 and 8.

7. A PRT involves placing the youth on the floor on his stomach with one YDA positioning himself across the youth's back and holding the youth's arms behind his back (the "primary" position) and another YDA holding the youth's legs down (the "secondary" position).

until March 16, 2000, one day past the deadline, to serve opposition papers. *See* Docket No. 127. Further, the defendants were granted until April 14, 2000 to serve reply papers, and the return date for the defendants' summary judgment motions was subsequently set for April 28, 2000. *See* Docket No. 129.

4. It should be noted that, while sympathetic to the plaintiffs' dilemma of having to oppose seven separate motions for summary judgment by the defendants, it has been exceedingly frustrating to analyze these motions because the plaintiffs repeatedly cite to either the incorrect exhibit number or the incorrect page number. As a result, it has been necessary to painstakingly investigate the voluminous exhibits submitted by all of the parties to find the exhibit or page number of which the plaintiffs speak.

ply the PRT under YDC Aubertine's supervision for another twenty minutes until Jackson was rendered unconscious. Thus, Jackson had been restrained for approximately thirty minutes. The facility's nurse, defendant Lilia Johnson ("Nurse Johnson"), was summoned to the scene. While waiting for the nurse to arrive, no attempts were made to revive Jackson.

Jackson was still being restrained when Nurse Johnson arrived at the juncture office. She observed that Jackson was "limp with his head erect and his eyes half open." (Lilia Johnson Dep. at 111–12.) She administered smelling salts, took Jackson's pulse, and evaluated his pupillary response by turning the flourescent lights off and on. She also applied hot and cold towels to his stomach. When Jackson failed to come out of a semiconscious state, Nurse Johnson directed that he be placed in a shower. YDA Thomas and YDA Lackey placed Jackson in a shower, after which he was brought to his room to change into dry clothes before being taken to the medical unit. When Jackson was unable to change his own clothing, YDA Thomas and YDA Lackey changed his shirt, leaving him in his wet pants. They then carried Jackson by his arms and legs to the medical unit for a post restraint evaluation by Nurse Johnson and an administrative review by YDC Aubertine.

YDC Aubertine asked a series of standard open-ended questions designed to evaluate Jackson's level of consciousness. The following questions and answers were exchanged during the course of YDC Aubertine's review:

Q. Why were you restrained (and/or placed in mechanical restraints, if applicable)?

A. "No"

Q. How were you restrained (and/or placed in mechanical restraints, if applicable)?

A. "No"

Q. Who were the staff involved?

A. "No"

Q. Where did it happen?

A. "No"

Q. Who saw it?

A. "No"

(Pls.' Ex. 6 at 3.)

After YDC Aubertine completed her evaluation, Jackson was escorted to a counter to sign post restraint forms. He was then brought back to a room to be evaluated by Nurse Johnson. When asked by Nurse Johnson, "Do you have any injuries or pain?," Jackson responded, "I can see you." (Pls.' Ex. 8b.) Jackson did not respond when Nurse Johnson asked him how he got his injuries. According to Nurse Johnson, Jackson performed some physical exercises slowly but satisfactorily. After her examination, Nurse Johnson cleared Jackson to be released back into the program.

Approximately one hour later, after being released from the medical unit, Jackson was taken to the cafeteria. One of Gossett's YDA's, Dwayne Robinson, stated that Jackson "looked sluggish, he looked spaced out. His shoulders were slumped forward, his head was down, he was dragging his right leg, he did not walk in a normal fashion." (Pls.' Ex. 164 at 2.) Some Gossett residents described Jackson as dazed and disheveled, weak, dizzy, and uncoordinated. (See Pls.' Summ. J. Exs. 48–52.) When Jackson attempted to secure a tray in the cafeteria, some of the trays fell to the ground.[8] As a result of this, YDA Wood escorted Jackson to the Spiritual Room and shouted at him. Jackson was then brought back to the cafeteria to eat breakfast.

When Jackson indicated that he was finished eating, he moved his entire tray toward the garbage can near the table. YDA Wood told Jackson not to throw away his plastic plates and utensils. How-

---

**8.** Several youths at the facility testified that they observed Jackson drop the trays. How-

ever, YDA Wood claims that Jackson knocked the trays to the floor.

ever, Jackson again moved the entire tray toward the garbage can, whereupon YDA Wood proceeded to place him in a PRT, assisted by YDA Lackey. YDA Wood and YDA Lackey, as well as defendants Eric Warner ("YDA Warner") and William Saphara ("YDA Saphara") alternated positions at various times during the second PRT.

Jackson did not resist the second restraint and initially stated that he was sorry. When YDC Aubertine arrived at the scene this time, Jackson was screaming that he could not breathe and had regurgitated some of the cereal that he had eaten for breakfast. Jackson stopped responding and went limp after approximately ten minutes. However, YDA Lackey believed that Jackson was feigning and therefore, this second PRT was not terminated for approximately twenty more minutes.

When the PRT was terminated, YDA Wood went to the medical unit to obtain smelling salts. Smelling salts were administered twice; Jackson did not respond either time. Cardiopulmonary Resuscitation ("CPR") was commenced after Emergency Medical Technicians arrived with an ambulance. Jackson was taken to Cayuga Medical Center where he remained comatose for approximately two months. Jackson now suffers from serious and permanent physical and mental injuries.

Plaintiffs have asserted nine causes of action. The FIRST cause of action alleges 1) excessive force under the Eighth and Fourteenth Amendments and deliberate indifference to life and safety against YDA Thomas, YDA Lackey, and YDA Wood, 2) failure to intervene and deliberate indifference to life and safety against YDA Warner, YDA Saphara, and YDC Aubertine, and 3) failure to train and supervise and deliberate indifference to life and safety against John Johnson ("Commissioner Johnson"), the Commissioner of DFY, and Steven Farkas ("Director Farkas"), Director of Gossett. The SECOND cause of action asserts the same claims as the first

cause of action, only pursuant to the Fifth and Fourteenth Amendments.

Plaintiff's THIRD cause of action alleges negligence against YDA Thomas, YDA Lackey, YDA Wood, YDA Warner, YDA Saphara, YDC Aubertine, Commissioner Johnson, and Director Farkas. Claim FOUR asserts 1) assault and battery and failure to provide medical care against YDA Thomas, YDA Lackey, and YDA Wood, and 2) failure to intervene and/or provide medical care against YDA Warner, YDA Saphara, and YDC Aubertine.

The FIFTH cause of action alleges 1) failure to provide adequate medical care in violation of the Eighth and Fourteenth Amendments against Nurse Johnson, YDA Thomas, YDA Lackey, YDA Wood, YDA Warner, YDA Saphara, and YDC Aubertine, and 2) failure to provide adequate medical care/training against Commissioner Johnson, and Director Farkas. The SIXTH cause of action asserts the same claims as the fifth cause of action, only pursuant to the Fifth and Fourteenth Amendments.

Plaintiff's SEVENTH cause of action alleges 1) negligent medical care and medical malpractice against Nurse Johnson, YDA Thomas, YDA Lackey, YDA Wood, YDA Warner, YDA Saphara, and YDC Aubertine, and 2) negligent supervision against Commissioner Johnson, and Director Farkas. Claim EIGHT alleges retaliation for the exercise of First and Fourteenth Amendment rights against all nine defendants. Finally, plaintiffs' NINTH cause of action alleges 1) unlawful seizure against YDA Thomas, YDA Lackey, and YDA Wood, and 2) failure to adequately train and supervise against Commissioner Johnson and Director Farkas.

## III. *DISCUSSION*

### A. *Claims by Terrisina Jackson*

The defendants claim that Terrisina Jackson ("Terrisina"), Lee Jackson's moth-

er,[9] has failed to plead any individual claims for relief and therefore, any purported claims made by her must be dismissed. Alternatively, the defendants claim that Terrisina's claims must be dismissed to the extent that they may be considered derivative to Lee Jackson's. The plaintiffs allege that Terrisina's claims are not derivative, but are based on the injuries she will suffer resulting from her loss of association with her son.

The notice pleading standard contained in the Federal Rules of Civil Procedure does not require a claimant to set out detailed facts upon which the claim for relief is based; it merely requires a statement sufficient to give adequate notice to the adverse party and enable preparation of a response. *See Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir.1988). In this case, even a liberal reading of the complaint does not reveal any individual claims on behalf of Terrisina. The complaint alleges in each cause of action that the defendants' conduct violated Lee Jackson's rights resulting in injury to him, and that therefore, both plaintiffs are entitled to compensatory and punitive damages. The complaint gives no notice to the defendants regarding the basis for any individual claims by Terrisina. Therefore, all claims purportedly asserted by Terrisina Jackson must be dismissed.

### B. *Summary Judgment Standard*

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.*, 949 F.2d 576, 580 (2d Cir.1991). The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact. Fed.R.Civ.P. 56;

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir.1990). Facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Project Release v. Prevost*, 722 F.2d 960, 968 (2d Cir.1983).

When the moving party has met the burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S.Ct. 1348. At that point, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56: *Liberty Lobby Inc.*, 477 U.S. at 250, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. To withstand a summary judgment motion, evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.*, 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348. Thus, summary judgment is proper where there is "little or no evidence … in support of the non-moving party's case." *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1223–24 (2d Cir.1994) (citations omitted).

### C. *Appropriate Constitutional Standard Fourteenth Amendment*

■ The parties dispute whether plaintiffs' constitutional claims should be analyzed under the Fourth, Eighth, or Fourteenth Amendment. For the reasons which follow, the Fourteenth Amendment is the more appropriate standard in this case.

The Eighth Amendment "was designed to protect those convicted of crimes, and consequently the [Cruel and Unusual Punishment] Clause applies 'only after the State has complied with the constitutional

---

**9.** Plaintiff Kateenya Thomas is Lee Jackson's aunt and was appointed his legal guardian.

guarantees traditionally associated with criminal prosecutions.'" *Whitley v. Albers*, 475 U.S. 312, 318, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986)(quoting *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977)).

While adjudication as a juvenile delinquent signifies that a youth under the age of sixteen committed an act which would constitute a crime if done by an adult, under New York law, "[n]o adjudication ... may be denominated a conviction and no person adjudicated a juvenile delinquent shall be denominated a criminal by reason of such adjudication." N.Y. Fam. Ct. Act § 380.1(1)(McKinney 1999). Further, "juveniles, when they are held, are held in noncriminal custody; they are persons civilly committed without the full panoply of protections attendant upon a criminal trial." *Pena v. New York State Div. for Youth*, 419 F.Supp. 203, 206 (S.D.N.Y. 1976). Finally, placement in the custody of the Division for Youth is not meant as punishment, but rather, to provide guidance and rehabilitation. *See Kent v. United States*, 383 U.S. 541, 554, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966); *Pena*, 419 F.Supp. at 206.

In the instant case, Jackson was adjudicated a juvenile delinquent in a noncriminal proceeding and placed in DFY custody pursuant to a Family Court order. Pursuant to New York State law, Jackson was not convicted of a crime and was not incarcerated at the time of the events complained of. Therefore, the Eighth Amendment ban on cruel and unusual punishment is inapplicable in this case.

■ The question becomes, then, whether the Fourth or Fourteenth Amendment is the appropriate standard to analyze plaintiffs' constitutional claims. This is a difficult question because the events which gave rise to this action arose "outside the seizure and confinement contexts protected by the Fourth and Eighth Amendments." *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir.1995). Further, the United States Supreme Court's decision in *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), called into question the viability of a Fourteenth Amendment substantive due process claim for excessive force. However, the Second Circuit has held that the substantive due process right to be free from excessive force in the non-arrestee and non-prisoner contexts remains "alive and well" in spite of the *Graham* decision. *Rodriguez*, 66 F.3d at 477; *Cf. Alexander S. v. Boyd*, 876 F.Supp. 773, 796 (D.S.C.1995)(holding that the due process clause of the Fourteenth Amendment is the appropriate federal standard by which to judge conditions at state juvenile detention centers)(citing *Santana v. Collazo*, 714 F.2d 1172, 1179 (1st Cir.1983)(stating that juveniles incarcerated in detention centers have not been convicted of a crime and therefore "have a due process interest in freedom from unnecessary bodily restraint which entitles them to closer scrutiny of their conditions of confinement than that accorded convicted criminals.")). Accordingly, the appropriate standard by which to analyze plaintiffs' constitutional claims is the Fourteenth Amendment.

### D. Excessive Force (FIRST and SECOND Causes of Action)

■ The due process clause of the Fourteenth Amendment guarantees an individual's freedom from unreasonable bodily restraint. *See Youngberg v. Romeo*, 457 U.S. 307, 316, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).[10] The Second Circuit has held that the analysis contained in *Hudson v. McMillian*, 503 U.S. 1, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), applies to excessive force claims brought under the Fourteenth

10. While *Youngberg* concerned the substantive due process rights of an involuntarily committed mentally retarded person, the analysis is appropriate in this case because, similar to *Youngberg*, the plaintiff was also involuntarily placed in a residential facility because of his status (as a juvenile delinquent).

Amendment. *United States v. Walsh,* 194 F.3d 37, 48 (2d Cir.1999). In *Hudson,* the United States Supreme Court stated that the core inquiry in assessing excessive force claims brought against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 7, 112 S.Ct. 995. Factors to consider are: "[T]he need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id.* (quoting *Whitley,* 475 U.S. at 321, 106 S.Ct. 1078). The extent of injury is another factor to consider which "may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" *Id.* (quoting *Whitley,* 475 U.S. at 321, 106 S.Ct. 1078).

Upon considering the factors listed above, there is sufficient evidence to survive summary judgment with respect to plaintiff's excessive force claims against the defendants. DFY policy provides that physical force may be necessary in the following circumstances: 1. By any staff member in self defense; 2. To protect others; 3. To protect the youth from self-harm; 4. To protect property of significant value; 5. To move a youth for reasons of safety or control; 6. To prevent a youth from escaping; and 7. To address an immediate threat to the safe, secure operation of the facility. (*See* Pls.' Ex. 129 ¶ F.) DFY policy also mandates that, before physical force is used, staff should attempt

> to persuade the resident to move to contain the situation and to discuss the problem .... Under any of the circumstances described in this section staff are required to take positive action using the approach which poses minimum risk of injury to staff or youth. Staff are expected to utilize nonforceful techniques to resolve problems whenever possible.

*Id.* ¶ G.

YDA Thomas alleges that he initiated the first PRT because Jackson balled his fists and glared at him in the juncture office. YDA Thomas claims he felt threatened by Jackson. However, YDA Thomas, and YDA Lackey, who assisted, are significantly taller and heavier than Jackson. Thus, it is questionable whether the PRT was necessary under the circumstances. In addition, there is no evidence that YDA Thomas or YDA Lackey attempted any other methods to defuse the perceived threat before placing Jackson in the PRT. Further, the evidence suggests that YDA Thomas, YDA Lackey, YDA Wood, YDA Warner, and YDA Saphara alternatively continued to hold Jackson in the PRT for approximately thirty minutes. Jackson was limp and unresponsive for twenty of those thirty minutes. Finally, the restraint took place under the supervision of YDC Aubertine, who admittedly had the authority to terminate the restraint.

YDA Wood alleges that he initiated the second PRT when Jackson proceeded to throw his entire tray into the garbage and stand up quickly and move toward YDA Lackey. This PRT lasted approximately twenty minutes and was continued even though Jackson had regurgitated his breakfast, was gasping for breath, and lost consciousness. YDC Aubertine also supervised this PRT. The YDA's involved in this PRT are also much larger than Jackson and questions of fact exists concerning whether physical force was necessary under the circumstances and whether the defendants used excessive force.

YDA Thomas, YDA Lackey, YDA Wood, YDA Warner, and YDA Saphara attempt to pass all responsibility for any consequences of the restraints to YDC Aubertine, who supervised both incidents. However, even assuming that physical force was necessary at all, the mere fact that YDC Aubertine supervised the incidents

does not absolve the other defendants of their duty to assess the need to initiate a PRT in the first place and to apply only the amount of force necessary under the circumstances.

The defendants assert that plaintiff's excessive force claim must be dismissed because there is no evidence that they used improper technique when applying the PRT's. However, the evidence demonstrates that it is questionable whether the PRT should have been applied at all. Further, no other methods were attempted to contain the situation. In addition, the plaintiff has submitted evidence which indicates that, even if proper technique is used, there is a danger of chest compression. (*See* Pls.' Ex. 87.) Thus, proper technique may still present risks of applying excessive pressure on a youth's chest and result in the inability to breathe.

In summary, issues of fact exist concerning the need for physical force, the amount of force used under the circumstances, and each defendants' role in the application of the PRT's. Therefore, summary judgment must be denied with respect to Jackson's excessive force claims against defendants YDA Thomas, YDA Lackey, YDA Wood, YDA Warner, YDA Saphara, and YDC Aubertine.

### E. Denial of Medical Care (FIFTH and SIXTH Causes of Action)

To state a § 1983 claim for deprivation of medical treatment in violation of the Eighth Amendment, a prisoner must show that the defendant acted with " 'deliberate indifference' to a substantial risk of serious harm." *Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996)(quoting *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

> The rights of one who has not been convicted are protected by the Due Process Clause; and while the Supreme Court has not precisely limned the duties of a custodial officer under the Due Process clause to provide needed medical treatment to a pretrial detainee,

it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner.

*Weyant,* 101 F.3d at 856 (citing *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991)).

■ Deliberate indifference under the Fourteenth Amendment may be established if the defendant "acted with reckless disregard for the substantial risk posed by the [plaintiff's] serious medical condition." *Id.* (citing *Farmer,* 511 U.S. at 836, 114 S.Ct. 1970 (stating that "acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.")). A plaintiff must show more than mere negligence, but proof of intent is not required. *See Farmer,* 511 U.S. at 835, 114 S.Ct. 1970 (stating that deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result."). Further, deliberate indifference may be manifested by doctors in their treatment or by other officials' intentional denial of medical care, delay in providing access to medical care, or intentional interference with prescribed treatment. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

■ Under the Eighth Amendment, a subjective standard is employed for assessing deliberate indifference, requiring a determination of whether the official knew of the risk to an inmate's health or safety. *Weyant,* 101 F.3d at 856. However, the Second Circuit has adopted an objective standard for assessing deliberate indifference claims under the due process clause of the Fourteenth Amendment. *See id.; see also Liscio v. Warren,* 901 F.2d 274, 276–77 (2d Cir.1990). This standard requires a "determination of what the official knew or should have known." *Weyant,* 101 F.3d at 856. Normally, "the state of the defendant's knowledge is ... a ques-

tion of fact to be determined after trial." *Id.*

■ "A serious medical condition exists where the failure to treat . . . could result in further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir.2000) (citations and internal quotations omitted). Factors which may be considered in assessing the severity of a particular condition "include 'the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic or substantial pain.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir.1998)(quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir.1992)).

### 1. *Nurse Johnson*

■ Nurse Johnson first argues that Jackson has failed to present evidence that neither the condition for which she treated him nor the alleged harm from that treatment were sufficiently serious to warrant constitutional protection. Nurse Johnson claims that, prior to the second PRT, all physical manifestations of the first PRT had resolved and therefore, plaintiff did not have a constitutional right to continued medical observation.

When Nurse Johnson came to the scene of the first PRT, Jackson was still being restrained and was limp with his eyes half open. (Lilia Johnson Dep. at 111–12.) While Jackson was in this semi-conscious state and before she conducted any examination, Nurse Johnson directed that Jackson be placed in a chair. She administered smelling salts, which Jackson responded to at first, but then his eyes closed, his head dropped to his chest and rolled from side to side, and he started to mumble. *Id.* at 76. Nurse Johnson administered smelling salts a second time merely to compare Jackson's reaction to his reaction to the first set of smelling salts. Before reviewing Jackson's medical history, examining him, or speaking to him, she concluded that he was faking injury and merely attempting to make people feel sorry for him. *Id.* at 111–113. Nurse Johnson never questioned staff present at the scene to determine the length of the restraint, the circumstances preceding her arrival, or Jackson's symptoms during the restraint. While she did conduct a cursory exam, she did not assess all of Jackson's vital signs, such as his blood pressure. In addition, she reported that his pulse was normal, a conclusion which plaintiff's expert calls into question. (*See* Kilpatrick Report at 3.)

After Nurse Johnson's initial "examination" of Jackson, he was semi-conscious but non-responsive to questioning. Nurse Johnson had already determined that Jackson was not injured when she directed staff to put him in the shower. Her stated purpose for this was to observe his response to external stimuli. *Id.* at 126. The necessity of this is questionable since up until this time, she had already administered two sets of smelling salts and placed hot and cold compresses on Jackson's stomach. After Jackson was placed in the shower, he was brought to the medical unit. Despite his inappropriate answers to her questions, *see supra* p. 284, Nurse Johnson concluded that Jackson was not injured and determined that he was able to return to the program.

While being escorted from the examination room to the desk to sign post restraint forms, Jackson fell down. He also dropped the pen given to him to sign the forms. Upon his release back into the program, residents described Jackson as sluggish, unsteady, retarded, staggering, dragging his right leg behind him, his eyes were half closed, and his head was down. Thus, contrary to Nurse Johnson's assertions, the plaintiff apparently still exhibited some physical problems when she released him back into the program.

Experts opined that during the first PRT, Jackson lost consciousness and as a result suffered a hypoxic event and was in

a weakened neurological condition. (Charash Dep. at 65; Kilpatrick Report at 2.) Dr. Leon Charash also opined that "[a]ny antecedent trauma that [Jackson] might have experienced would have reduced his reserve and made him . . . more vulnerable to the ultimate crash requiring CPR." (Charash Report at 2.) Kirkpatrick defined Jackson's condition after the first PRT as an "emergent condition of apparent unconsciousness and resulting neurological injury." (Kilpatrick Report at 4.) Jackson was unable to walk on his own and was unresponsive to questioning by staff.

It is troubling that Nurse Johnson even attempts to claim that loss of consciousness and unresponsiveness are not serious medical issues. In addition, her attempt to justify her actions by claiming that Jackson was feigning injury to gain attention is also troubling. She reached that conclusion before examining Jackson. Further, it is possible that a youth may give one or two indications that he/she is feigning injury. However, in this case, Jackson exhibited numerous symptoms and physical manifestations of a serious medical condition requiring thorough treatment. There are certainly issues of fact in this case concerning whether Nurse Johnson's treatment was constitutionally sufficient.

Nurse Johnson's assertion that there is no causal connection between the treatment she rendered after the first restraint and the injuries sustained in the second restraint are also rejected. Nurse Johnson had a duty to prevent Jackson's return to the program in a vulnerable state. Dr. Charash's report suggests that the first PRT may have left Jackson in a weakened neurological condition. Moreover, it is reasonably foreseeable that by returning Jackson to the program when he was still staggering and dropping things could subject him to further injury.

## 2. YDA Thomas, YDA Lackey, YDA Wood, YDA Warner, YDA Saphara, and YDC Aubertine

█ The defendants claim that they did not perceive any serious medical risk and did not deny Jackson access to medical treatment. The evidence shows that YDA Saphara had left the scene while Jackson was still being restrained, but before he lost consciousness. Therefore, the plaintiff fails to present any evidence that YDA Saphara denied Jackson access to medical treatment and this claim against YDA Saphara must be dismissed.

With respect to defendants YDA Thomas, YDA Lackey, YDA Wood, YDA Warner, and YDC Aubertine, it is simply implausible that they did not believe that becoming unconscious and unresponsive was not serious. In addition, there is evidence that Jackson was still being held in the PRT for a significant period of time after losing consciousness and that after being released from the restraint, YDC Aubertine directed the YDA's to push on Jackson's chest to make sure he was not holding his breath. Further, Jackson's pulse was never checked until Nurse Johnson arrived and CPR was not performed until EMT's arrived after the second PRT.

YDA Thomas, YDA Lackey, YDA Wood, and YDA Warner also claim that they merely followed the instructions of YDC Aubertine and Nurse Johnson. However, these men cannot absolve themselves of responsibility for their actions merely by passing the blame to their supervisor and the nurse. If they thought that Jackson was in medical distress, they should have acted upon that perception.

Accordingly, for the aforementioned reasons, Jackson's claims of inadequate medical care against Nurse Johnson, YDA Thomas, YDA Lackey, YDA Wood, YDA Warner, and YDC Aubertine should not be dismissed.

## F. Retaliation Claim (EIGHTH Cause of Action)

█ To state a claim under § 1983 that a state actor retaliated against a plaintiff for exercising a constitutional right, the

plaintiff must show "that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the ... officials' decision to discipline the plaintiff." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996)(citing *Mount Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)); *Davidson v. Chestnut*, 193 F.3d 144, 148 (2d Cir.1999). If the plaintiff satisfies that burden, then the defendants must show that they would have taken the same action "even in the absence of the plaintiff's protected conduct-that is, 'even if they had not been improperly motivated.'" *Davidson*, 193 F.3d at 148–49 (quoting *Henderson*, 89 F.3d at 80). "Thus, if taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone." *Henderson*, 89 F.3d at 79 (citations omitted).

Jackson argues that the defendants retaliated against him for filing complaints of staff abuse at Oatka.[11] However, there is no evidence that Jackson ever filed any complaint of staff abuse or pursued any grievance against staff at Oatka. Rather, Jackson apparently merely told the Intake Officer at Gossett, Brian Sweet, that he was beaten by staff at Oatka. Even if that is the case, that is not an act which would be considered the exercise of a constitutional right. Further, there is no evidence that Sweet informed the staff of, or that the staff ever knew of, plaintiff's complaint. In fact, the evidence shows that the staff only knew, based upon reading the log book, that Jackson was a new transfer and that *he* allegedly assaulted staff at Oatka, not that he had been assaulted. Consequently, plaintiff's retaliation claim must be dismissed.

### G. *Unlawful Seizure (NINTH Cause of Action)*

The defendants contend that the plaintiff has failed to show that he was the subject of an unconstitutional seizure. The plaintiff has failed to assert any opposition to this argument. Therefore, this claim should be dismissed.

### H. *Supervisory Liability of Commissioner Johnson and Director Farkas*

■ A plaintiff must establish the personal involvement of the defendant prior to the assessment of damages in a § 1983 case. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977). A supervisory official can be said to have been personally involved in a constitutional violation, and thus be subjected to § 1983 scrutiny. A supervisor is considered to have been personally involved when he or she (1) directly participated in the violation; (2) failed to remedy the wrong after learning of the violation through a report or appeal; (3) created a custom or policy fostering such violations, or allowed such a custom or policy to continue; or (4) was grossly negligent in managing subordinates who caused the violation. *Colon*, 58 F.3d at 873; *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir.1986).

Defendants Commissioner Johnson and Director Farkas contend that the plaintiff has failed to show that they were personally involved in any alleged unconstitutional conduct because they were not physically present at Gossett when the alleged conduct occurred. They further assert that there is no evidence that they are liable for failure to train or supervise because there were no known risks from a properly performed PRT. However, without deciding the merits of these claims, the plaintiff has presented sufficient evidence to create issues of fact with respect to their failure to train and/or supervise subordinates.

Plaintiff does not contest that Commissioner Johnson and Director Farkas were

---

11. Jackson also argues that the defendants retaliated against him for uttering obscenities. However, this is not alleged in the complaint and therefore, will not be considered here.

not physically present at the Gossett facility when the events giving rise to this action occurred. Therefore, for Jackson's supervisory liability claim to survive summary judgment, he must present some evidence that his injuries were the result of Commissioner Johnson's and Director Farkas' failure to adequately train and/or supervise staff at Gossett.

■ The plaintiff has presented evidence that prior to his appointment as Director of DFY, Commissioner Johnson was aware of investigations of abuse by staff in DFY facilities. He was also aware that, in October of 1994, a fifteen year old boy died at a facility while being restrained by staff. As a result of this death, DFY and a Delaware County grand jury conducted investigations. Both bodies issued reports which revealed that even a properly performed PRT presents a danger of chest compression which prevents the ability to breathe. (*See* Pls.' Exs. 70, 123.)

As a result of these investigations and reports, DFY circulated two memoranda, in January and February of 1995, which instructed directors to hold additional training sessions in order to address some issues associated with holding a youth in a PRT. Subsequently, in a March 31, 1995 memorandum, a copy of which was sent to Commissioner Johnson, Executive Deputy Director of DFY, Edward Bartley advised

> It is apparent that our staff are not capable of using [the restraint] technique. *Either it is too complicated for them to learn or they are not trained properly* or the chaos just prior to a restraint does not lend itself to this method. Mr. Devane ordered a complete review of the restraint techniques early last year. The only progress that I can ascertain is correspondence reaffirming the appropriateness of the current technique and the process used to select it in the first place. During this period, a youth died while being restrained. The DA's report instructed

DFY to review the techniques and *it appears nothing has been done to date.* (Pl.'s Ex. 138)(emphasis added). It appears that the restraint policy was not changed until July of 1997, over one year after Jackson suffered his injuries. Thus the evidence suggests that Commissioner Johnson was aware of the potential dangers associated with the PRT. Whether his response was reasonable or constituted deliberate indifference to Jackson's constitutional rights is a question for a jury to determine.

■ Director Farkas claims that, while he was director of Gossett when Jackson was injured, he was not the director of that facility in early 1995 when the purported updated training sessions occurred. He further claims that, while at Gossett, he observed that training was updated in accordance with DFY policy. However, the plaintiff has presented evidence that, assuming that the updated training sessions were conducted, staff admitted that no special training was ever given with respect to the dangers associated with the PRT or how a youth can be injured while being held in a PRT. (*See* Thomas Dep. at 46–48, Lackey Dep. 23–26.) Thus, a question of fact exists concerning whether Director Farkas took appropriate steps while director of Gossett to ensure that staff were trained on the hazards presented by the PRT.

Both Commissioner Johnson and Director Farkas assert that training concerning the provision of medical services are mandated by DFY and facility policy and that Gossett staff were trained in the medical issues necessary for their position. Therefore, they contend, the plaintiff cannot show that they failed to train or supervise their staff on the provision of medical services. However, other than their self-serving assertions that such training was provided, Commissioner Johnson and Director Farkas present no evidence that such training occurred. In addition, it is questionable that whatever training which was purportedly given was adequate, given

the evidence in this case that medical attention was not provided immediately upon Jackson's loss of consciousness. Therefore, this issue must also be determined by a jury. Accordingly, issues of fact exist which precludes summary judgment with respect to the plaintiff's FIRST, SECOND, FIFTH, and SIXTH causes of action against Commissioner Johnson and Director Farkas.

### I. *Qualified Immunity*

The doctrine of qualified immunity "shields government officials performing discretionary functions from being held liable for civil damages arising from their actions which do 'not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *P.C. v. McLaughlin*, 913 F.2d 1033, 1039 (2d Cir.1990)(citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity "affords protection to a government official only from suits in his individual capacity." *Id.* A decision in favor of a public official based on qualified immunity is appropriate if: (1) the conduct attributed to him is not prohibited by federal law; or (2) if such conduct is so prohibited but the plaintiff's right not to be subjected to such conduct was not clearly established at the time of the defendant's actions; or (3) if it was not objectively reasonable for the official to know that his conduct violated that right. *See X–Men Sec., Inc. v. Pataki*, 196 F.3d 56, 65–66 (2d Cir.1999).

It is undisputed that at the time of the alleged conduct, Jackson had a clearly established right to adequate medical care and to be free from excessive force. Therefore, accepting the facts as alleged by the plaintiff, and drawing all inferences most favorably to him, it must be determined whether as a matter of law it was objectively reasonable for the defendants to believe that their conduct did not violate the plaintiff's clearly established rights. *See Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.)(citing *Robison v. Via*, 821 F.2d 913, 921 (2d Cir.1987)), *aff'g* 761 F.Supp. 962 (D.Conn.1991). Under the circumstances of this case it was not.

Commissioner Johnson and Director Farkas were aware that DFY's restraint policy caused risks of serious injury and additional training was needed. However, there are too many unsettled questions concerning the measures taken by these defendants and whether they were adequate. They have also failed to present any evidence concerning the type and frequency of medical training DFY staff received. Therefore, Commissioner Johnson and Director Farkas are not entitled to qualified immunity.

Nurse Johnson only asserts qualified immunity with respect to her decision to release Jackson back into the program after the first restraint. In light of the evidence presented by the plaintiff that he continued to exhibit physical symptoms associated with the first restraint during the entire time Nurse Johnson observed him as well as after she released him into the program, and that she did not question staff or conduct a thorough examination of the plaintiff, her conclusion that Jackson was merely trying to receive sympathy and that all physical manifestations had resolved was not objectively reasonable. Consequently, Nurse Johnson is also not entitled to qualified immunity at this time.

YDC Aubertine, YDA Thomas, YDA Lackey, YDA Wood, YDA Warner, and YDA Saphara all claim that their conduct was objectively reasonable because the PRT's were performed in accordance with their training. However, questions exist concerning whether or not both restraints were initiated in contravention of DFY policy. Additionally, it is not objectively reasonable to believe that restraining an individual to the point of unconsciousness is permissible. Finally, failing to attempt measures to resuscitate Jackson after he lost consciousness or begin medical treatment is also not objectively reasonable. Thus, YDC Aubertine, YDA

Thomas, YDA Lackey, YDA Wood, YDA Warner, and YDA Saphara should not now receive the benefit of qualified immunity.

Viewing the facts most favorably to the plaintiff Jackson, *see supra* pp. 282–86, none of the defendants are entitled to qualified immunity as a matter of law. Whether or not questions of fact on this issue are to be presented to a jury must await trial. *See Golino,* 950 F.2d at 871; *see also Warren v. Dwyer,* 906 F.2d 70, 74 (2d Cir.1990)(stating that, where factual issues exist prior to trial, defense of qualified immunity may be raised at the close of plaintiff's case on a motion for a directed verdict and on a subsequent motion for judgment notwithstanding the verdict)(citing *Krause v. Bennett,* 887 F.2d 362, 365 (2d Cir.1989)).

### J. State Law Claims [12]

#### 1. Absolute Immunity

The defendants contend that plaintiff's state law claims should be dismissed because they "were performing discretionary acts when they allegedly violated state law with respect to Lee Jackson," (Joint Mem. on Legal Standards at 18), and therefore, they are entitled to absolute immunity. "The absolute immunity for quasi-judicial discretionary actions is founded on public policy and is generally said to reflect the value judgment that the public interest in having officials free to exercise their discretion unhampered by the fear of retaliatory lawsuits outweighs the benefits to be had from imposing liability." *Arteaga v. State,* 72 N.Y.2d 212, 216, 527 N.E.2d 1194, 1196, 532 N.Y.S.2d 57, 59 (1988).

■■■ State and local employees are entitled to absolute immunity "when they perform discretionary, as opposed to ministerial, functions." *Tenenbaum v. Williams,* 193 F.3d 581 (2d Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). However, such immu-

nity only applies to discretionary "decisions of a judicial nature–i.e., decisions requiring the application of governing rules to particular facts, an 'exercise of reasoned judgment which could typically produce different results.' " *Arteaga,* 72 N.Y.2d at 216, 527 N.E.2d at 1196, 532 N.Y.S.2d at 59 (quoting *Tango v. Tulevech,* 61 N.Y.2d 34, 41, 459 N.E.2d 182, 186, 471 N.Y.S.2d 73, 77 (1983)). Ministerial acts, in contrast, require "direct adherence to a governing rule or standard with a compulsory result." *Id.*

■■■ In the instant case, the YDA defendants were not performing discretionary functions with respect to the restraints of Lee Jackson. First, YDA's must adhere to DFY policy, which only provides for seven justifications for applying a restraint. Second, the manner in which the restraint is applied is also mandated by DFY policy. Thus, YDA's are constrained to follow rules promulgated by DFY. Therefore, YDA Thomas, YDA Lackey, YDA Wood, YDA Warner, YDA Saphara, and YDC Aubertine are not entitled to absolute immunity.

■■■ Nurse Johnson is also not entitled to absolute immunity because medical treatment decisions are also governed by a standard of care set forth by DFY. Finally, Commissioner Johnson and Director Farkas are not entitled to absolute immunity. Their generalized decisionmaking with respect to training and supervision of their employees do not involve "the application of governing rules to particular facts," *Arteaga,* 72 N.Y.2d at 216, 527 N.E.2d at 1196, 532 N.Y.S.2d at 59, and therefore, their functions are not judicial in nature.

#### 2. Assault and Battery (FOURTH Cause of Action)

■■■ YDA Thomas, YDA Lackey, and YDA Wood [13] allege that they are not lia-

---

**12.** All of the defendants urge dismissal of plaintiff's pendent state law claims, pursuant to 28 U.S.C. § 1367(c)(3). However, since all of the plaintiff's federal claims have not been dismissed, defendants' argument is rejected.

ble for assault and battery because exercised reasonable force in restraining Jackson. However, as has already been discussed, there are questions of fact concerning whether the amount of force used in restraining Jackson was excessive. Therefore, plaintiff's assault and battery claims against YDA Thomas, YDA Lackey, and YDA Wood should not be dismissed.

### 3. *Negligence (THIRD and SEVENTH Causes of Action)* [14]

YDA Lackey and YDA Wood allege that they "were authorized to implement the restraint techniques in which they had been instructed." (Mem. by Lackey & Wood in Supp. of Mot. for Summ. J. at 12.) Therefore, YDA Lackey and YDA Wood claim, plaintiff cannot prove that their conduct in restraining him fell below DFY standards for administering a PRT. As such, they claim that they did not breach any duty of care owed to Jackson, and therefore the negligence claims against them should be dismissed. However, as already discussed, questions of fact exist concerning whether YDA Wood initiated the PRT in contravention of DFY policy and whether YDA Lackey and YDA Wood used excessive force in administering the PRT's. Therefore, summary judgment on plaintiff's negligence claim is improper.

YDA Thomas claims that plaintiff's state law claims against him should be dismissed because the plaintiff cannot show that there is a causal link between his initiation of the first PRT and the ultimate injuries he suffered. However, at the very least, there is a triable issue of fact regarding injuries suffered by Jackson as a result of the first PRT. The plaintiff has submitted evidence that the first PRT left Jackson in a weakened and more vulnerable state. Such injuries, if proven, are compensable.

■ Commissioner Johnson and Director Farkas assert three main arguments in support of dismissal of plaintiff's state law claims against them. First, they claim that the restraints were not the proximate cause of Jackson's injuries. In this regard, Commissioner Johnson and Director Farkas contend that Jackson's injuries were caused by "an underlying metabolic myopathy" which results in the muscles becoming tired or damaged from physical stress. (Farkas Mem. at 20.) However, questions of fact exist concerning whether Jackson actually suffers from this condition and whether such a condition could have caused the severe neurological injuries which he suffered. Therefore, summary judgment on this basis is precluded.

■ Second, Commissioner Johnson and Director Farkas claim that plaintiff's injuries were unforeseeable because there was no known risk from a properly performed restraint. This assertion is rejected. The evidence suggests that Commissioner Johnson and Director Farkas were aware of the dangers to youth associated with the PRT and that additional training was necessary. It is reasonably foreseeable that their failure to ensure that proper training was done or that the policy with respect to restraints was changed would result in injuries of the type suffered by Jackson.

■ Finally, Commissioner Johnson and Director Farkas assert that the PRT's were precipitated by Jackson's own culpable conduct. Assuming arguendo that Jackson may have been partially responsible for the incident in question by being

---

**13.** YDA Thomas, YDA Lackey, and YDA Wood are the only defendants who have moved to dismiss plaintiff's assault and battery claim on grounds other than absolute immunity.

**14.** YDA Warner, YDA Saphara, YDC Aubertine, and Nurse Johnson did not assert any specific grounds to dismiss the negligence claims against them. However, YDA Saphara is being dismissed from the seventh cause of action for the same reasons set forth above at *supra* pp. 291–92.

disobedient, this does not absolve the defendants of liability for their own conduct. They still owe Jackson a duty of care to prevent abuse by staff, and to ensure that staff are trained in the appropriate circumstances to administer a PRT and the manner in which to execute it.

## IV. *CONCLUSION*

In summary, the plaintiff suffered severe and debilitating injuries while in the custody and care of the defendants. Although some of the plaintiff's claims cannot survive summary judgment, the tragic circumstances surrounding the events of June 1, 1996 give rise to numerous issues of fact concerning the necessity of placing Lee Jackson in a physical restraint, the amount of force used in doing so, as well as the adequacy of the medical treatment provided to Jackson after he had been rendered unconscious. Summary judgment dismissing the plaintiff's entire complaint is, therefore, improper in light of the existence of these issues.

Accordingly, it is

ORDERED, that the defendants' motions for summary judgment are GRANTED in part and DENIED in part;

1. The motions are GRANTED to the extent that the following claims are DISMISSED:

a. All claims by Terrisina Jackson;

b. Plaintiff's claims against the defendants in their official capacities;

c. Plaintiffs' claim of denial of medical care (FIFTH, SIXTH, and SEVENTH causes of action) against YDA William Saphara;

d. Plaintiffs' retaliation claims (EIGHTH cause of action); and

e. Plaintiffs' claim of unconstitutional seizure (NINTH cause of action).

2. The remainder of defendants' motions are DENIED, and this action shall proceed to trial with respect to the following claims:

a. Excessive force/failure to train and supervise (FIRST and SECOND causes of action), negligence (THIRD and SEVENTH causes of action), and denial of adequate medical care/failure to train and supervise (FIFTH and SIXTH causes of action) against defendants Commissioner John Johnson and Director Stephen Farkas;

b. Excessive force (FIRST and SECOND causes of action), negligence (THIRD and SEVENTH causes of action), assault and battery (FOURTH cause of action), and denial of adequate medical care (FIFTH and SIXTH causes of action) against defendants YDA Clarence Thomas, YDA Jon Lackey, and YDA Gary Wood;

c. Excessive force/failure to intervene (FIRST and SECOND causes of action), negligence (THIRD and SEVENTH causes of action), assault and battery/failure to intervene (FOURTH cause of action), and denial of adequate medical care (FIFTH and SIXTH causes of action) against defendants YDA Eric Warner and YDC Shelly Aubertine;

d. Excessive force/failure to intervene (FIRST and SECOND causes of action), negligence (THIRD cause of action), and assault and battery/failure to intervene (FOURTH cause of action), against defendant YDA William Saphara; and

e. Denial of adequate medical care (FIFTH and SIXTH causes of action) and negligence/medical malpractice (SEVENTH cause of action) against defendant Nurse Lilia Johnson.

IT IS SO ORDERED.