**Bernadette DIPACE, et al., Plaintiffs,**

v.

**Glenn S. GOORD, et al., Defendants.**

**No. 02Civ.5418(WHP)(GWG).**

United States District Court, S.D. New York.

March 3, 2004.

Joan Magoolaghan, Koob & Magoolaghan, New York City, for Plaintiffs.

Daniel Schulze, Assistant Attorney General, New York City, for Defendants.

## ORDER

PAULEY, District Judge.

On January 29, 2004, Magistrate Judge Gabriel W. Gorenstein issued a report and recommendation ("report") describing why this Court should deny plaintiffs' motion to amend their complaint pursuant to Federal Rule of Civil Procedure 15(a). As of this date neither party has submitted any objection to the report nor requested an extension of time in which to do so. Accordingly, the Court finds that the report is not facially erroneous, and affirms and adopts it. Therefore, plaintiffs' motion to amend their complaint is denied.

SO ORDERED.

## REPORT AND RECOMMENDATION

GORENSTEIN, United States Magistrate Judge.

On August 10, 1999, Ralph Tortorici committed suicide while in the custody of the New York State Department of Correctional Services ("DOCS") at Sullivan Correctional Facility. Plaintiffs, the estate and survivors of Ralph Tortorici, initially sued the Commissioner of DOCS, the Commissioner of the New York State Office of Mental Health, and various mental health practitioners alleging that they were deliberately indifferent to Tortorici's severe mental illness. Plaintiffs now seek to amend the complaint to add claims against Corrections Officer Keith Krause, Corrections Officer John Skinner, and Nurse Cynthia Murphy for failing to provide cardio-pulmonary resuscitation ("CPR") after Tortorici's body was discovered. The proposed amended complaint also contains new claims against the Commissioner of DOCS, Glenn S. Goord, based on DOCS's policies and procedures relating to emergency medical treatment. For the reasons below, plaintiffs' motion should be denied.

## I. BACKGROUND

Ralph Tortorici had a long history of mental illness that was known to DOCS. *See* Final Report of the New York State Commission of Correction, dated June 23, 2000 ("COC Report") (annexed as Ex. 11 to Declaration of Joan Magoolaghan, filed August 11, 2003 (Docket # 33) ("Magoolaghan Decl.")), ¶¶ 3–6 (detailing Tortorici's contacts with the mental health system, including four inpatient hospitalizations during his incarceration). Tortorici was last seen alive in his prison cell at 4:32 a.m. on August 10, 1999. *Id.* ¶ 10. At 4:47 a.m., Corrections Officer ("CO") Krause found Tortorici hanging by his neck from a sheet in his cell. *Id.* ¶¶ 1, 10; New York State Police Investigation Report ("Police Report") (annexed as Ex. 7 to Magoolaghan Decl.), Continuation Sheet ¶ 5. Security and medical staff—including CO Skinner and Nurse Murphy—responded to the "code blue" emergency. COC Report ¶ 10; Police Report, Continuation Sheet ¶¶ 11, 20.

A police investigator interviewed CO Krause on the day of the suicide and noted in the report:

On 8/10/99 Member interviewed CO Krause who stated that he is assigned as the E North Block rover and is responsible for completing rounds to check on inmates locked in their cell. [CO Krause] stated that he completed rounds all evening and the last round completed without incident was at 4:32 a.m. . . . [CO Krause] then started another round at approximately 4:47 a.m. and located Inmate Tortorici hanging in his cell. [CO Krause] immediately radioed for assistance, requested the control officer to

open cell # 143, and entered cell # 143. [CO Krause] lifted [Tortorici] slightly where [CO Krause] was able to pull the looped sheet off the clothing shelf and lower [Tortorici] to the floor. [CO Krause] then slipped the loop from around [Tortorici's] neck. The response team started to arrive and evaluated [Tortorici].

Police Report, Continuation Sheet ¶ 5. The investigator also interviewed CO Skinner:

On 8/10/99 Member interviewed CO John Skinner who stated that he responded to the code blue medical emergency and found CO Krause kneeling next to [Tortorici]. CO Skinner checked [Tortorici] for breathing and a pulse with negative results. A short time later, RN Murphy arrived and assessed [Tortorici] for vital signs with negative results.

*Id.* ¶ 20. As for Nurse Murphy, the report indicated:

On 8/10/99 Member interviewed RN Cynthia Murphy who stated that she responded to the code blue medical emergency. Upon arrival RN Murphy found [Tortorici] lying on his back with his head toward the cell door. [Tortorici's] eyes were partially open and there was no radial or carotid pulse. RN Murphy used a stethoscope and was unable to hear any heart rate. RN Murphy rolled [Tortorici] and noticed blanching of the shoulders which is a sign of obvious death. Lividity was also setting in. Because of these indications, no resuscitation efforts were started.

*Id.* ¶ 11. The COC Report stated that Nurse Murphy's failure to commence CPR "violated a departmental directive." COC Report ¶ 11.

Plaintiffs filed the complaint in this action on July 12, 2002. *See* Complaint, filed July 12, 2002 (Docket # 1). They filed a First Amended Complaint on August 1, 2002. *See* First Amended Complaint, filed August 1, 2002 (Docket # 2). The First Amended Complaint alleges that Tortorici's suicide was the result of a failure to provide adequate and appropriate psychiatric care. *See id.* ¶¶ 1, 14–91. No allegations were made regarding any lack of resuscitation efforts. CO Krause, CO Skinner, and Nurse Murphy were not named as defendants. Plaintiffs now argue that they learned new facts during discovery that support claims for deliberate indifference against these defendants as well as additional claims against Commissioner Goord. *See* Plaintiffs' Memorandum of Law in Support of Motion to Add Parties, filed August 11, 2003 (Docket # 32) ("Pl.Mem."), at 1–2.

Plaintiffs devoted the bulk of their initial moving papers to two potential defenses that they expected would be raised by the proposed defendants: the statute of limitations, *see* Pl. Mem. at 11–16, and qualified immunity, *id.* at 16–25. With respect to the first issue, plaintiffs argued that the claims they propose adding are not time-barred because the causes of action did not accrue until the plaintiffs discovered the alleged wrongful conduct or, alternatively, that the statute of limitations should be equitably tolled because information critical to asserting the causes of action was in the sole control of defendants and not discovered despite plaintiffs' diligent efforts. *See id.* at 12–15. On the second issue, plaintiffs argued that the proposed defendants are not entitled to qualified immunity because the right to adequate medical care for serious medical needs was clearly established and no reasonable jury could find that it was objectively reasonable for the defendants to do nothing to attempt to save Tortorici's life under the circumstances. *See id.* at 20–25. As expected, defendants responded that the applicable statute of limitations and the qualified immunity doctrine render the proposed amendment futile. *See* Defendants' Opposi-

tion to Plaintiffs' "Motion to Add Parties," filed September 2, 2003 (Docket # 42) ("Def.Mem."), at 4–23. Both the plaintiffs' moving papers and the defendants' opposition papers annexed extensive evidence, including deposition transcripts and documentary evidence. *See* Magoolaghan Decl.; Declaration of Thomas W. White, filed August 11, 2003 (Docket # 33) ("White Decl."); Declaration of Daniel Schulze, filed September 2, 2003 (Docket # 43) ("Schulze Decl."); Reply Declaration of Joan Magoolaghan, filed September 5, 2003 (Docket # 45) ("Magoolaghan Reply Decl."). The plaintiffs alone submitted a total of 43 separate exhibits.

In addition, plaintiffs submitted another proposed second amended complaint with their reply papers that included factual allegations relating to their argument that the existence of their cause of action had been fraudulently concealed. *See* Proposed Second Amended Complaint (Revised) ("Proposed Am. Compl.") (annexed as Ex. 32 to Magoolaghan Reply Decl.), ¶¶ 81–100. As a result, the Court allowed defendants to submit a supplemental memorandum of law in response and allowed plaintiffs to reply to that submission. *See* Defendants' Supplemental Memorandum of Law in Opposition to Plaintiffs' "Motion to Add Parties," filed October 3, 2003 (Docket # 48) ("Def.Supp.Mem."); Plaintiffs' Supplemental Memorandum of Law in Support of Motion to Add Parties, filed October 9, 2003 (Docket # 49) ("Pl.Supp. Mem."). The motion to amend has now been fully briefed.

Because the Court concludes that the defendants are entitled to qualified immunity and that the proposed amendment to the complaint is therefore futile, the motion to amend should be denied. It is thus unnecessary to reach the parties' arguments regarding the statute of limitations.

## II. DISCUSSION

### A. Law Governing a Motion to Amend

Fed.R.Civ.P. 15(a) provides that leave to amend "shall be freely given when justice so requires." Nonetheless, leave to amend may be denied where the proposed amendment would be "futil[e]." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). A proposed amendment is futile when it fails to state a claim. *See Health–Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir.1990). Thus, it is settled that a court may deny leave to file a proposed amended complaint where " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir.1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Where a plaintiff has submitted a proposed amended complaint, the court "may review that pleading for adequacy and need not allow its filing if it does not state a claim upon which relief can be granted." *Id.*

Normally, a motion to amend is adjudicated without resort to any outside evidence. *See Nettis v. Levitt*, 241 F.3d 186, 194 n. 4 (2d Cir.2001) ("Determinations of futility [of amendment] are made under the same standards that govern Rule 12(b)(6) motions to dismiss."); *see also Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir.1989) ("On a motion to dismiss, the district court must limit itself to a consideration of the facts alleged on the face of the complaint and to any documents attached as exhibits or incorporated by reference." (citations omitted)). This case presents the unusual situation, however, where the plaintiffs themselves have chosen not to rely on the bare allegations of the proposed pleading (the sufficiency of which neither side has addressed) but instead have presented extensive extrinsic

evidence to justify its filing. As already noted, it was plaintiffs—not defendants—who first raised the issues of qualified immunity and the statute of limitations in their motion papers. *See* Pl. Mem. at 11–25. More significantly, it was plaintiffs who first submitted evidence outside the record, consisting of dozens of exhibits. *See* Magoolaghan Decl. Defendants have responded in kind by also submitting and relying on evidence outside the pleadings in opposing the motion. *See* Schulze Decl.

Neither party has objected to the other's submitting such evidence and both rely heavily on the outside evidence in making their arguments. In addition, the plaintiffs have not asserted that any additional discovery is being sought with respect to the matters raised in the amended complaint. *See* Magoolaghan Decl. ¶ 29 ("plaintiffs do not anticipate any further discovery relating to the claims set forth against" the proposed new defendants). As a consequence, plaintiffs obviously seek to have the Court's judgment on the futility of the proposed amended complaint rise or fall depending on whether the proposed amended complaint could withstand a motion for summary judgment—either on the basis of the statute-of-limitations bar or qualified immunity.

This manner of proceeding, while unusual, finds support in cases in which courts have looked outside the pleadings in order to determine whether an amended complaint is futile. *See, e.g., Milanese v. Rust–Oleum Corp.,* 244 F.3d 104, 110–11 (2d Cir.2001) (summary judgment standard applied where motion to amend was made in response to summary judgment motion); *Health–Chem,* 915 F.2d at 810 (same); *Stoner v. N.Y.C. Ballet Co.,* 2002 WL 523270, at *14 n. 10 (S.D.N.Y. Apr. 8, 2002) (denying motion to amend seeking to add claim which "might survive a motion to dismiss" but would "immediately be subject to dismissal on a motion for summary judgment"). This procedure is also analogous to, and consistent with, a court's conversion of a motion to dismiss into one for summary judgment where the parties have presented evidence outside the pleadings and are aware that the court intended to rely on such evidence. *See, e.g., In re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir.1985) ("A party cannot complain of lack of a reasonable opportunity to present all material relevant to a motion for summary judgment when both parties have filed exhibits, affidavits, counter-affidavits, depositions, etc. in support of and in opposition to a motion to dismiss."), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986); *accord Groden v. Random House, Inc.,* 61 F.3d 1045, 1052–53 (2d Cir.1995); *see also* Fed.R.Civ.P. 12(b).

Accordingly, the Court will accept the plaintiffs' invitation to judge the proposed complaint based on whether it could survive a motion for summary judgment from defendants on the issue of qualified immunity or the statute of limitations. In other words, for purposes of gauging whether the proposed amendment is "futile," the Court will consider whether there is an absence of a "genuine issue as to any material fact" on these issues such that the defendants would be "entitled to a judgment as a matter of law" under Fed.R.Civ.P. 56(c).

### B. *Summary Judgment Standard*

On a motion for summary judgment, all factual inferences must be drawn in favor of the non-moving party. *See, e.g., Savino v. City of New York,* 331 F.3d 63, 71 (2d Cir.2003) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). While the plaintiffs are the movant with respect to the motion to amend, the defendants are in a position equivalent to that of a party moving for summary judgment inasmuch as it

is their burden to show affirmatively that they are entitled to qualified immunity. *See, e.g., Crawford–El v. Britton,* 523 U.S. 574, 587, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998). Thus, the Court draws all factual inferences in favor of the plaintiffs. However, to survive a motion for summary judgment, the plaintiffs "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (emphasis omitted) (quoting Fed.R.Civ.P. 56(e)). "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998) (citation omitted). Thus, the defendants "must prevail if the [plaintiffs] fail[ ] to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to [their] case." *Allen v. Cuomo,* 100 F.3d 253, 258 (2d Cir.1996) (citing *Anderson v. Liberty Lobby,* 477 U.S. at 247–48, 106 S.Ct. 2505).

## C. *Section 1983*

Plaintiffs' proposed claims are brought under 42 U.S.C. § 1983. Under this statute, a plaintiff must show that there has been a denial of a constitutional or federal statutory right and that the deprivation of such right occurred under color of state law. *See* 42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). Section 1983 does not grant any substantive rights but rather "provides only a procedure for redress for the deprivation of rights established elsewhere," such as in the Constitution. *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citation omitted), *cert. denied,* 512 U.S. 1240, 114 S.Ct. 2749, 129 L.Ed.2d 867 (1994). The defendants do not contest that they were acting under color of state law. Thus, the only issue is whether plaintiffs have shown the violation of a constitutional right.

## D. *Qualified Immunity*

Even if plaintiffs show the violation of a constitutional right, the doctrine of qualified immunity shields government employees who are performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (citations omitted). Where a qualified immunity defense is raised, a court must make a two-fold inquiry. First, the court must determine whether the facts, "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Second, even where such a constitutional right has been violated, the government employee is entitled to qualified immunity "'if either (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law.'" *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (quoting *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001)).

"A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) 'a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful.'" *Anderson v. Recore,* 317 F.3d at 197 (alterations in original) (quoting *Young v. County of Fulton,* 160 F.3d 899, 903 (2d Cir.1998)). For a right to be clearly established, it is not sufficient for a

general constitutional right to have been recognized; rather, the right must be established in "a more particularized ... sense." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)—that is, "in light of the specific context of the case," *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. Thus, the relevant inquiry "is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202, 121 S.Ct. 2151; *see also Hope v. Pelzer*, 536 U.S. 730, 741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (the "salient question" is whether the state of the law at the time of the violation gave officers "fair warning").

### E. *Deliberate Indifference*

■ To establish a violation of the Eighth Amendment arising out of inadequate medical treatment, a prisoner is required to prove "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The deliberate indifference standard consists of both an objective and a subjective prong. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) ("*Hathaway I*"), *cert. denied*, 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995).

■ Under the objective prong, the alleged medical need must be "sufficiently serious." *Id.* (citations omitted). A serious medical need is "a condition of urgency, one that may produce death, degeneration or extreme pain." *Id.* (internal quotation marks and citation omitted).

■ Under the subjective component, the prisoner must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving the prisoner of adequate medical treatment. *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996) ("*Hathaway II*"). "[T]he subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970.

As reflected in *Hathaway II* and the case law cited therein, it is beyond dispute that in August 1999 case law clearly established that deliberate indifference to an inmate's serious medical needs amounted to a violation of the Eighth Amendment. *See* 99 F.3d at 553. But the existence of such case law by itself is not sufficient to determine whether the proposed defendants in this case are entitled to qualified immunity. This is because the right at issue must be clearly established "in light of the specific context of the case." *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151. On the other hand, to defeat qualified immunity, it is not necessary to show a decision squarely on point indicating the violation of a constitutional right. *See Anderson v. Creighton*, 483 U.S. at 640, 107 S.Ct. 3034. Thus, if there were no cases at all regarding the constitutional obligation to perform CPR on an inmate, it would not mean that plaintiffs' claims necessarily would fail.

It turns out, however, that case law does exist on the specific subject of a government official's constitutional obligations when confronted with an apparently lifeless person in his or her custody. It is appropriate to examine such case law both to determine the nature of the substantive

constitutional right and to determine whether the case law gave the three proposed defendants here "fair warning" of their constitutional obligations in such a situation. *Hope,* 536 U.S. at 741, 122 S.Ct. 2508. With respect to the latter issue, only case law arising prior to August 1999 is relevant inasmuch as the qualified immunity question is resolved based upon the law established at the time of the incident in question. *See, e.g., Hanrahan v. Doling,* 331 F.3d 93, 98 (2d Cir.2003). Furthermore, while it is unclear the extent to which district court decisions, *id.* at 98 n. 6, or the case law of other circuits, *Poe v. Leonard,* 282 F.3d 123, 141 n. 15 (2d Cir.2002), may be taken into account in evaluating whether a right is clearly established, such case law is relevant in determining whether there has been a constitutional violation.

### F. *Cases Involving the Constitutional Obligation to Perform CPR*

*Heflin v. Stewart County,* 958 F.2d 709, 711 (6th Cir.), *cert. denied,* 506 U.S. 998, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992), like the present case, involved a situation where a pretrial detainee was found hanging in his cell and no effort was made to perform CPR or other resuscitation efforts. The Sixth Circuit affirmed a jury verdict that a sheriff and his deputy were deliberately indifferent to the decedent's serious medical needs because they left the decedent hanging for at least twenty minutes after discovering him, there was some evidence that the medical examiner heard a heartbeat, and there was evidence of animus between the sheriff and the decedent. *Id.* at 711–16. The court also affirmed the district court's determination that the officers were not entitled to qualified immunity. *Id.* at 717–18. However, one court has stated that "[w]hether *Heflin* remains good law after *Farmer v. Brennan* is highly questionable," *Clinton v. County of York,* 893 F.Supp. 581, 586

(D.S.C.1995), on the ground that *Heflin* was decided prior to *Farmer* and applied only the objective prong of the deliberate indifference analysis, *see id.*

*Clinton* is the case most similar factually to the present case. In *Clinton,* officers discovered an inmate hanging by a noose fashioned from a bed sheet. After they cut him down, they laid the inmate's body on a mattress pad and checked for vital signs. They found no pulse or breathing. The officers did not attempt CPR because they believed that the inmate was already dead. 893 F.Supp. at 583–84. The court granted summary judgment in favor of the officers, holding that absent any allegations of ill will, the officers' failure to perform CPR was at most negligence, not deliberate indifference. *Id.* at 586–87. In so ruling, *Clinton* cited to an unpublished decision of the Fourth Circuit, *Ward v. Holmes,* 28 F.3d 1212, 1994 WL 313624 (4th Cir.1994), in which the Fourth Circuit held on similar facts that "[b]ased on the absence of pulse and respiration, in combination with [the inmate's] appearance and the temperature of his body, [the defendants] believed that [the inmate] was dead.... Because the officers believed that [the inmate] was dead, their failure to attempt to resuscitate him was at most negligence." *Id.* at *7, 28 F.3d 1212.

Another case similar to *Clinton* is *Reed v. Woodruff County,* 7 F.3d 808, 809 (8th Cir.1993), where a prisoner was found hanging in his cell and no resuscitation efforts were undertaken. The court held that the only evidence in the record was that the prisoner was dead and in the absence of evidence that resuscitation efforts would have succeeded, there was no constitutional violation. *Id.* at 811.

More recently (and after the incident involving Tortorici), two cases denied qualified immunity based at least in part on a failure to perform life-saving medical

treatment. In *Jackson v. Johnson*, 118 F.Supp.2d 278, 283–85 (N.D.N.Y.2000), *appeal dismissed in relevant part*, 13 Fed. Appx. 51, 2001 WL 735902 (2d Cir.2001), aides in a youth detention facility physically restrained Jackson, the fourteen-year-old plaintiff, twice in a short period of time, rendering him unconscious both times. The second restraint continued for approximately 20 minutes after Jackson "went limp" because the aides thought he was "feigning." *Id.* at 285. After the second restraint was terminated, Jackson did not respond to smelling salts and CPR was not performed until Emergency Medical Technicians arrived with an ambulance. *Id.* As a result of the incident, Jackson was comatose for approximately two months and suffered serious and permanent physical and mental injuries. *Id.* Jackson asserted, *inter alia*, that the aides who restrained him improperly denied him immediate medical treatment. The district court denied defendants' motion for summary judgment on claims of excessive force and deliberate indifference, *id.* at 287–91, and held that the defendants were not entitled to qualified immunity, *id.* at 294–95. Included in its discussion was the observation that if the aides "thought that Jackson was in medical distress, they should have acted upon that perception." *Id.* at 291. *Jackson*, however, does not establish that the failure to attempt to resuscitate an inmate is objectively unreasonable in all circumstances. Rather, it demonstrates that such a failure may constitute deliberate indifference in a situation where the defendants not only disregarded an excessive risk to an inmate's health but also caused the risk and continued to do so in the face of obvious evidence that they were causing serious harm. *Id.* at 283–85, 289–91.

In another recent case, corrections officers ordered inmates to stop performing CPR on a fellow inmate who had a heart attack in the yard, despite positive results brought about by their efforts. *Tlamka v. Serrell*, 244 F.3d 628, 630–31 (8th Cir. 2001). Due to this order, the inmate's condition deteriorated immediately, yet no further efforts were made to resuscitate him until he was transported to a prison nurse, up to ten minutes later. *Id.* at 631. The Eighth Circuit held that such inaction and affirmative denial of care "would rise to a showing of deliberate indifference." *Id.* at 633. In examining whether the officers nevertheless were entitled to qualified immunity, the court held that it was well-settled that "an intentional delay in obtaining medical care for an inmate could give rise to a violation" and any reasonable officer would know that delaying emergency medical treatment for ten minutes for no reason was a violation of the Eighth Amendment. *Id.* at 634–35.

G. *Whether Defendants Either Violated the Constitution or Are Entitled to Qualified Immunity*

With this background in mind, we will examine how the case law applies to the facts adduced as to each proposed defendant.

1. *CO Krause*

CO Krause is the corrections officer who first discovered Tortorici hanging in his cell during his routine rounds at 4:47 a.m. Upon discovering Tortorici hanging, CO Krause attempted to use his radio to call a "code blue"—indicating an emergency— and to get the door to Tortorici's cell opened. COC Report ¶ 10; Police Report, Continuation Sheet ¶ 5; Deposition of Keith K. Krause, March 27, 2003 ("Krause Dep.") (annexed as Ex. 26 to Magoolaghan Decl.), at 37–39. His radio was not working, however, so he had to run approximately 150 feet to the control room, where he pounded on the door and screamed to the officer inside that he had a code blue.

Krause Dep. at 37. The control room officer inside then opened the cell door as CO Krause ran back to Tortorici's cell. *Id.* From the time CO Krause left Tortorici's cell until the time he returned, less than 30 seconds elapsed. *Id.* at 39.

CO Krause then entered the cell, lowered Tortorici's body to the ground, and removed the sheet from around his neck. Krause Dep. at 37, 39. CO Krause had some training in CPR, although he did not think he was certified at the time of this incident. *Id.* at 25–27. Nonetheless, he did not commence CPR because he "thought the inmate was dead" and he heard the doors opening, meaning that other personnel had arrived on the scene. *Id.* at 39–40. He testified that he was not trained to determine if an individual is dead or not. *Id.* at 40. He believed his responsibility in this situation was "to call a code blue ... and to make sure that medical assistance gets to the inmate." *Id.* at 41.

In light of recent case law, it would be reasonable to conclude today that prison officials have a duty to administer life-saving care even in the absence of a pulse or respiration where circumstances indicate the possibility of a very recent death and the individuals are available to give such care. *See, e.g., Tlamka,* 244 F.3d at 632–35; *Jackson,* 118 F.Supp.2d at 289–91, 294–95. Given the expected imminent arrival of medical personnel, however, it might not be the case that the Constitution imposes that obligation on an individual officer under the circumstances in which CO Krause found himself.

■ In any event, it is plain that any such right was not clearly established in 1999 because the law in this area was not "defined with reasonable clarity," *Anderson v. Recore,* 317 F.3d at 197. The *Clinton* case by itself makes this point. The factual circumstances of *Clinton,* decided in 1995, are not materially distinguishable from the facts here: prison officials who believed that an inmate found hanging in his cell was already dead. *See* 893 F.Supp. at 583–84. As noted, the *Clinton* court concluded explicitly that the officials' failure to administer CPR was at most negligence, not deliberate indifference. *Id.* at 586–87. While the Sixth Circuit found a constitutional violation by the officers in *Heflin,* CO Krause's conduct was far different from the reaction of the *Heflin* officers, who left the inmate hanging for twenty minutes. 958 F.2d at 711–16. In addition, other case law has specifically held that summoning medical assistance is a constitutionally appropriate response where a person in custody is without vital signs. *See Price v. County of San Diego,* 990 F.Supp. 1230, 1235, 1242–44 (S.D.Cal. 1998) (officers placed arrestee in a physical restraint, rendering him unable to breathe and causing his heartbeat to stop, but did not remove restraint or administer CPR); *see also id.* at 1243 ("the constitution does not impose a duty on peace officers to administer CPR personally").

In addition to the unpublished decision cited in *Clinton,* an unpublished decision from the Eighth Circuit, *Bahner v. Carmack,* 1997 WL 94705, 107 F.3d 875 (8th Cir.1997), reached a result similar to *Clinton*—refusing to find that a corrections officer acted with deliberate indifference in failing to enter the cell or perform CPR on an inmate until another officer had arrived approximately 7 minutes later. *Id.* at *1– 2, 107 F.3d 875. Instead, *Bahner* found that the officer's conduct amounted only to negligence. *Id.* at *2, 107 F.3d 875. While normally the Court would not cite an unpublished decision of a circuit court, *Bahner* is relevant not for any precedential value but rather for the evidence it provides with respect to the qualified immunity issue: if a circuit court—even in an unpublished opinion—disclaims the exis-

tence of a right, it would be virtually impossible to conclude that the purported right had been "defined with reasonable clarity," *Anderson v. Recore,* 317 F.3d at 197.

Given this case law—and in particular the *Clinton* decision and the case it cites—it cannot be said that in August 1999 the law had "defined with reasonably clarity" that CO Krause had the constitutional obligation to administer CPR when he believed Tortorici was dead and reasonably expected that emergency help was on its way. Nor could we find that "a reasonable defendant would have understood from the existing law that his conduct was unlawful," *Anderson v. Recore,* 317 F.3d at 197.

Because this Court cannot conclude that the state of the law at the time of the incident gave CO Krause "fair warning that [his] alleged treatment of [Tortorici] was unconstitutional," *Hope,* 536 U.S. at 741, 122 S.Ct. 2508, CO Krause is entitled to qualified immunity from suit.

### 2. *CO Skinner*

■ CO Skinner responded to the code blue medical emergency and was next to arrive on the scene following CO Krause. Police Report, Continuation Sheet ¶ 20. CO Skinner had been trained and certified in CPR prior to August 10, 1999. Deposition of John T. Skinner, March 25, 2003 ("Skinner Dep.") (portions annexed as Ex. 27 to Magoolaghan Decl. and portions as Ex. F to Schulze Decl.), at 40–41. CO Skinner testified unequivocally at his deposition that when he arrived at the scene: "I didn't detect either [a pulse or breathing] and I checked the second time to make sure." *Id.* at 39. The investigatory report also indicates that he checked for a pulse and respiration and found neither. Police Report, Continuation Sheet ¶ 20. This statement is supported by a contemporaneous note written by DOCS investigator Steven Shaner at the time of his

interview with CO Skinner, which states: "I checked for a pulse, respiration, which I detected none." Report of Interview of John Skinner by Steven Shaner, dated August 10, 1999 ("Shaner Report") (annexed as Ex. 28 to Magoolaghan Decl.), at 1; *see* Deposition of Steven Shaner, June 3, 2003 ("Shaner Dep.") (portions annexed as Ex. 17 to Magoolaghan Decl. and portions as Ex. E to Schulze Decl.), at 28–29.

Plaintiffs now assert that Tortorici was alive at the time CO Skinner examined him. Pl. Mem. at 5, 7–8. The sole basis for this assertion is a contradictory note written by Shaner that appears immediately following the above-quoted note. That second note states: "I think I felt a pulse, but I'm not sure." Shaner Report at 1. Based on this second note, plaintiffs now argue that Ralph Tortorici "was alive at the time of his discovery, and that, but for the deliberate indifference to his life shown by the proposed defendants, it is highly probable that he would have survived his suicide attempt." Pl. Mem. at 7–8. However, plaintiffs have submitted no medical evidence indicating that Tortorici actually had a pulse or was breathing at the time CO Skinner arrived. Nor have they pointed to any other witness who has stated that Tortorici had any such vital signs.

At his deposition, Shaner testified that CO Skinner never reviewed or endorsed these interview notes. *See* Shaner Dep. at 18. When CO Skinner was asked about this statement at his deposition, he testified that he did not remember making such a statement to the investigator. Skinner Dep. at 89. As noted, CO Skinner also unequivocally denied in his sworn testimony that he had felt a pulse or detected breathing. Specifically, he stated: "I didn't detect either [a pulse or breathing] and I checked the second time to make sure." *Id.* at 39.

The question thus becomes whether, in the face of the above evidence, a reasonable jury could conclude that CO Skinner in fact detected a pulse or breathing. The Court will assume *arguendo* that the second note would be admissible at trial on the ground that Shaner's notes of his interview, although hearsay, would constitute a past recollection recorded, *see* Fed. R.Evid. 803(5), and that the alleged statement from CO Skinner would be the statement of a party-opponent, *see* Fed.R.Evid. 801(d)(2). The second note, however, constitutes but the thinnest wisp upon which to rest plaintiffs' claim that CO Skinner knew Tortorici was alive and thus "[knew] of and disregard[ed] an excessive risk to inmate health or safety," *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. The second note refers to a statement that was not sworn and that does not even indicate that CO Skinner "knew" Tortorici had a pulse or breathing. Instead, it states only that he "think[s]" he felt a pulse "but [is] not sure." Arrayed against this single equivocal note is CO Skinner's own sworn testimony that he in fact did not detect a pulse or breathing. In addition, the report written by Shaner, which was based on the notes he had made of the interviews, itself states that CO Skinner did not detect a pulse or breathing.

It would be pointless to conduct a trial on this issue, however, because no reasonable jury could use the single, equivocal, hearsay note in the investigator's report to make a factual finding that CO Skinner in fact felt a pulse at the time he discovered Tortorici's body. As the Second Circuit has held, *"some* evidence is not sufficient to withstand a properly supported motion for summary judgment; a plaintiff opposing such a motion must produce sufficient evidence to support a rational finding" with respect to the material fact at issue. *Woroski v. Nashua Corp.*, 31 F.3d 105, 109–10 (2d Cir.1994) (emphasis in original and citations omitted); *see also Niagara*

*Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir.2003) ("The 'mere existence of a scintilla of evidence' supporting the non-movant's case is ... insufficient to defeat summary judgment." (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505)). In this case, the only evidence plaintiffs have mustered would be insufficient to support a finding that CO Skinner felt a pulse or breathing.

In the absence of a pulse or breathing, CO Skinner was in a situation similar to CO Krause and the same "deliberate indifference" analysis that applies to CO Krause thus applies to CO Skinner as well. The only arguably material difference in their situations was that CO Skinner at one point allegedly stated that he did not attempt CPR because he did not have the CPR equipment on the scene. *See* Inspector General's Office Investigative Report, dated January 2, 2000 (annexed as Ex. 14 to Magoolaghan Decl.); *accord* Shaner Report at 1–2. In response, plaintiffs have pointed to evidence that a face mask necessary to perform CPR was kept in the "immediate vicinity" of the cell block where Tortorici was housed, *see* Pl. Mem. at 5; *see also* Skinner Dep. at 75–76, though they have provided no evidence that CO Skinner himself knew it was there. Again, the Court would be prepared to find a constitutional obligation on an officer in CO Skinner's situation to perform CPR, provided the officer could do so without an unreasonable danger to him- or herself. But even if CO Skinner was in a position to perform CPR, it would not alter the fact that the law was not clear in this area and that, indeed, case law at the time actually suggested that there was no such constitutional obligation. In the absence of any evidence from which a reasonable jury could conclude that Tortorici had vital signs or that CO Skinner harbored ill will against Tortorici, CO Skinner is in a position identical to CO

Krause: both encountered a body without vital signs, with medical help known to be on the way. For the same reasons already stated with respect to CO Krause, CO Skinner is entitled to qualified immunity from suit.[1]

### 3. *Nurse Murphy*

██ Nurse Murphy responded to the code blue medical emergency and arrived at Tortorici's cell at approximately 4:52 a.m. COC Report ¶ 10; Police Report, Continuation Sheet ¶ 11. Nurse Murphy was trained and certified in CPR prior to August 10, 1999. *See* Deposition of Cynthia Murphy, March 27, 2003 ("Murphy Dep.") (portions annexed as Ex. 29 to Magoolaghan Decl. and portions as Ex. H to Schulze Decl.), at 12–13. She testified that when she entered the cell: "I ... went to the patient's left side, checked his radial pulse, I checked the [carotid] pulse, I then checked the apical pulse, I checked his eyes." *Id.* at 37. She could not hear a heartbeat even with a stethoscope. Police Report, Continuation Sheet ¶ 11; *see* Murphy Dep. at 38. She rolled Tortorici over and noticed blanching of the shoulders, "a sign of obvious death," and reported that lividity had begun setting in. Police Report, Continuation Sheet ¶ 11; Murphy Dep. at 37, 39. Thus, she did not commence life-saving measures. Police Report, Continuation Sheet ¶ 11; COC Report ¶ 10.

As was true for CO Krause and CO Skinner, the only evidence in the record is that Nurse Murphy believed that Tortorici was dead based on her evaluation of him. Perhaps as an argument that Nurse Murphy harbored ill will towards inmates, plaintiffs argue that Nurse Murphy has a "personal policy against administering CPR to prisoners." Plaintiffs' Reply Memorandum of Law in Support of Motion to Add Parties, filed September 5, 2003 (Docket # 44) ("Pl. Reply Mem."), at 9; *see also* Pl. Mem. at 19. But the deposition testimony plaintiffs rely on for this statement demonstrates that Nurse Murphy had a policy of not performing *mouth-to-mouth* resuscitation to inmates due to the risk of disease; she clearly stated that she performed CPR on inmates with the aid of an "ambu-bag." Murphy Dep. at 69–70.

Plaintiffs also point to the fact that Nurse Murphy violated a DOCS directive in failing to commence CPR. Pl. Mem. at 5, 16–20; *see also* COC Report ¶ 11; Division of Health Services, Policy No. 1.41, *Do Not Resuscitate*, dated April 1, 1996 (annexed as Ex. 30 to Magoolaghan Decl.), ¶ I.B (requiring "First Responders" to "immediately" commence CPR on "any person found unresponsive and without pulse or respirations"). But the violation of this state policy does not provide a basis for finding that there was a violation of the federal Constitution.

---

1. Plaintiffs have also asserted that CO Skinner testified "that his standard for deciding whether or not to provide CPR differed depending on whether the victim is a family member, a non-family free person, or an incarcerated person, with the incarcerated person being the le[ast] likely to receive the benefits of his training and expertise." Pl. Mem. at 18 n. 5; *see also* Pl. Supp. Mem. at 9–10. The record provided to this Court, however, in no way supports this statement. In fact, the record shows that CO Skinner testified that he was not trained to give CPR different- ly inside and outside of the facility. Skinner Dep. at 41–42. While he stated that "[m]y job ..., as an EMT outside the facility, is to save lives," *id.* at 54–55, he also stated that "[i]nside the facility, security is ... your concern, *in addition to* safety and well being of an inmate," *id.* at 42 (emphasis added). None of this testimony would allow a reasonable jury to conclude that CO Skinner had an anti-inmate animus sufficient to show that his actions were the result of "deliberate indifference."

Finally, plaintiffs have submitted a declaration from a psychologist, Thomas W. White, which states, "[B]ased on my participation in countless suicide investigations over the course of my career, it is impossible for lividity to set in within twenty minutes of a person's death." White Decl. ¶ 9. This statement, however, merely constitutes evidence contradicting Nurse Murphy's view that lividity had set in. It says nothing about whether Tortorici was in fact dead—or had a pulse or respiration—when Nurse Murphy examined him. Thus, this statement would be insufficient to allow a jury to conclude that Tortorici was in fact alive at the time Nurse Murphy found him.

In sum, taking all evidence in their favor, plaintiffs at best have made the case that Nurse Murphy was faced with a body without pulse or respiration—but one that theoretically might still have benefitted from a resuscitation effort, such as CPR. And, as the Court previously noted with respect to CO Krause, the Court would be prepared to hold that a trained prison employee's failure to commence such efforts where there is no danger to the employee—and when faced with a person who might benefit from such efforts—constituted a violation of the Eighth Amendment's "deliberate indifference" standard (although it is unclear that plaintiffs have mustered enough evidence to show that Tortorici might have benefitted from resuscitation efforts by the time Nurse Murphy arrived). Such a ruling, however, would be of no assistance to plaintiffs for the same reasons already stated as to CO Krause: case law existing in 1999 disagreed with this premise and declares that the failure to conduct CPR does not constitute a constitutional violation. *See, e.g.,*

*Clinton,* 893 F.Supp. at 586–87. Because of the lack of clarity in the law at that time, Nurse Murphy is entitled to qualified immunity from suit.

### 4. *Commissioner Goord*

Plaintiffs' proposed amended complaint also seeks to add three new claims against Commissioner Goord for failing to ensure that prison staff were adequately and appropriately trained in the administration of CPR. *See* Proposed Am. Compl. ¶¶ 22, 147–55. In their proposed amended complaint, plaintiffs allege that Commissioner Goord "developed and maintained an ineffective and inadequate system of suicide prevention and emergency medical responses" that, *inter alia,* "fails to assure that DOCS' employees are adequately trained in protocols for suicide prevention and emergency medical response." *Id.* ¶¶ 148, 151, 154. According to plaintiffs, these failings deprived Tortorici of his Fifth, Eighth, and Fourteenth Amendment rights. *See id.*

Plaintiffs did not discuss in their moving papers—beyond a mere mention—the new allegations against Commissioner Goord. *See* Pl. Mem. at 5–6. They made no argument regarding the legal bases for the new claims against Goord in the proposed amended complaint beyond a generic reference to supervisory liability. *See id.* at 23. Not surprisingly, the defendants did not discuss the allegations in their responsive papers.[2]

Given the disposition of the claims against the three proposed new defendants, it seems unlikely that the complaint could state a claim against Commissioner Goord, thus rendering the proposed claims "futile." In a related context, the Second

---

**2.** When plaintiffs noted this fact in their reply brief, Pl. Reply Mem. at 6 n. 4, defendants responded with a short paragraph in their supplemental memorandum arguing, *inter*

*alia,* that the allegations fail on the merits and that Commissioner Goord was not personally involved in formulating the policies at issue, Def. Supp. Mem. at 11–12.

Circuit has suggested that where "evidence fail[s] to establish [the] basis for [a] claim against individual defendants," summary judgment is appropriately granted to an institutional defendant. *Escalera v. Lunn*, 361 F.3d 737 (2d Cir. March 18, 2004) (citing *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 281–82 (2d Cir.1999)). The Court need not reach this issue, however, because the plaintiffs' moving papers simply do not address the proposed amendment as to Commissioner Goord in sufficient detail to permit the Court to grant the motion to amend. In other words, their papers do not demonstrate that these claims meet the requirements of Fed.R.Civ.P. 15(a).

*Conclusion*

For the foregoing reasons, plaintiffs' motion to amend should be denied.

### PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to file any objections. *See also* Fed.R.Civ.P. 6(a), (e). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. William H. Pauley, III, 500 Pearl Street, New York, New York 10007, and to the undersigned at 40 Centre Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Pauley. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See*

*Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

January 29, 2004.